*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

V

ROMANTE JOMALL ADAMS,

      Defendant-Appellant.

UNPUBLISHED
August 20, 2020

No. 347308
Wayne Circuit Court
LC No. 18-001562-01-FC

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

V

BRIAN KYLE SHERROD,

      Defendant-Appellant.

No. 347434
Wayne Circuit Court
LC No. 18-001562-02-FC

Before: REDFORD, P.J., and METER and O'BRIEN, JJ.

PER CURIAM.

In these consolidated appeals,[1] in Docket No. 347308, defendant, Romante Jomall Adams, appeals as of right his jury trial convictions of first-degree premeditated murder, MCL 750.316(1)(a); intentionally discharging a weapon from a vehicle, causing death, MCL 750.234a(1)(d); felon in possession of a firearm (felon-in-possession), MCL 750.224f; and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Adams was sentenced as a fourth-offense habitual offender, MCL 769.12, to life imprisonment without the possibility of parole for his first-degree premeditated murder conviction, 30 to 60

---

[1] *People v Adams*, unpublished order of the Court of Appeals, entered February 12, 2019 (Docket Nos. 347308 and 347434).

-1-

years' imprisonment for his intentionally discharging a weapon from a vehicle causing death conviction, 6 to 10 years' imprisonment for his felon-in-possession conviction, and five years' imprisonment for his felony-firearm conviction. We affirm Adams's convictions and sentences.

In Docket No. 347434, defendant, Brian Kyle Sherrod, who was tried jointly with Adams, also appeals as of right his jury trial convictions of first-degree premeditated murder, intentionally discharging a weapon from a vehicle causing death, felon-in-possession, and felony-firearm. Sherrod was sentenced as a fourth-offense habitual offender, MCL 769.12, to life imprisonment without the possibility of parole for his first-degree premeditated murder conviction, 30 to 60 years' imprisonment for his intentionally discharging a weapon from a vehicle causing death conviction, 6 to 10 years' imprisonment for his felon-in-possession conviction, and five years' imprisonment for his felony-firearm conviction. We affirm Sherrod's convictions, but remand for the ministerial task of correcting Sherrod's judgment of sentence.[2]

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Adams and Sherrod went to a liquor store in Detroit, Michigan, on December 22, 2017, at about 7:00 p.m. At that time, the victim; the victim's friend, Raymond Hawkins; and the victim's fiancée, Bianca Sharp; were also at the liquor store. Adams and the victim entered into a verbal altercation while inside the liquor store. After being separated, but before leaving, Adams pointed at the victim and said, "I got you." Adams and Sherrod then drove away in Adams's vehicle. About ten minutes later, the security footage from the liquor store showed Adams's vehicle returning to the scene. Concurrently, Sharp, Hawkins, and the victim left the liquor store. The victim went toward the back of the building and was out of view of the security cameras when Sherrod and Adams opened fire from the vehicle. The victim was shot twice, causing his death. During the shooting, Sherrod's right hand was struck by a bullet fired from the AR-15 being shot by Adams. The bullet also struck the nine-millimeter Glock 17 handgun that was being fired by Sherrod. While driving away from the scene of the shooting, Adams's vehicle struck another car. Adams then drove quickly away.

---

[2] We have cited to the sentence issued in the written judgment of sentence for Sherrod because, generally, "[a] court speaks through its written orders and judgments, not through its oral pronouncements." *People v Mysliwiec*, 315 Mich App 414, 418 n 2; 890 NW2d 691 (2016) (quotation marks and citation omitted). However, the written judgment of sentence appears to have been issued in error. During the sentencing hearing for Sherrod, the trial court stated that Sherrod would be sentenced as a third-offense habitual offender, MCL 769.11. More, the trial court stated that Sherrod's sentence would be 30 to 50 years' imprisonment for his intentionally discharging a weapon from a vehicle causing death conviction, 5 to 10 years' imprisonment for his felon-in-possession conviction, and two years' imprisonment for his felony-firearm conviction. Indeed, the oral sentence imposed by the trial court corresponds to the felony information for Sherrod, which included a third-offense habitual offender notice, and indicated that the potential penalty for the felony-firearm charge was two years' imprisonment. Although none of the parties raise this issue, we believe it is imperative to remand for the limited purpose of correcting or clarifying the judgment of sentence for Sherrod.

Police investigation led to Adams's vehicle being located at a nearby apartment building, where Adams was regularly seen. The vehicle had significant front-end damage, and blood from Sherrod's wound led from the passenger-side door of the vehicle to the front porch of the apartment. After obtaining a search warrant, the police discovered inside the apartment an AR-15 and a nine-millimeter, which were determined to have fired bullets at the scene of the crime; ammunition for the AR-15; cleaning supplies; and Sherrod's blood. His blood was also found inside the vehicle. Adams's DNA was found on the steering wheel of the car.

When Adams discovered that police were looking for him, he contacted a family friend, Officer Adlone Morris, who also happened to be a police officer. Officer Morris contacted Detective Jeb Rutledge, the officer-in-charge of the investigation, about Adams's desire to turn himself in for questioning. Detective Rutledge said Adams should do so; however, Adams decided against it. Instead, Adams changed his cell phone number and went to Tennessee. Eventually, Sherrod and Adams were arrested and charged with the crimes of which they were eventually convicted.

Before trial, the prosecution provided notice that it would seek admission of evidence under MRE 404(b). Specifically, in a statement to police regarding a separate investigation, Sherrod stated that he was involved in a separate fatal shooting on the same day as the event of the present case, but about one hour before. In that statement, Sherrod also admitted to using the nine-millimeter Glock 17 handgun in that other shooting, and asserted he shot the gun in self-defense.

The prosecution's theory of the case was that Adams and Sherrod worked together to shoot and kill the victim. Adams's defense was that he was not at all involved in the shooting. Sherrod claimed that he acted alone and in self-defense. Particularly, Sherrod testified that he saw the victim pull a gun from his waistband, Sherrod feared for his life, and shot at the victim to save himself. Sherrod further claimed that, in the process of that shooting, he shot himself with the AR-15, while he was also holding the Glock 17 handgun. The prosecution was permitted to admit evidence of Sherrod's involvement in the previous shooting to rebut that testimony, arguing that it was incredibly unlikely that one person would be involved in two events requiring him to kill someone in self-defense in the span of about an hour. After hearing all of the evidence, the jury convicted Sherrod and Adams as already noted. This appeal followed.

## II. DOCKET NO. 347308

### A. *BATSON*[3] VIOLATION

Adams argues that the trial court erred when it determined that the prosecution had not committed *Batson* violations. We disagree.[4]

---

[3] *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986).

[4] In a Standard 4 brief, Sherrod has also challenged the trial court's determination that there were not *Batson* violations. Sherrod's brief contains only the statement of the question presented, without any additional argument. In other words, Sherrod has not provided any law, facts, or

## 1. STANDARD OF REVIEW

*Batson* challenges involve three distinct steps of analysis, the first of which considers whether the defendant has made a prima facie case of discrimination and "is appropriately categorized as a mixed question of law and fact." *People v Knight*, 473 Mich 324, 342; 701 NW2d 715 (2005). The first step, therefore, "is subject to both a clear error (factual) and a de novo (legal) standard of review." *Id.* "An appellate court reviews de novo *Batson*'s second step, which centers on whether the prosecutor set forth a race-neutral explanation for the strikes." *People v Tennille*, 315 Mich App 51, 61; 888 NW2d 278 (2016). Finally, as related to the third step of a *Batson* analysis, "[i]t is well-settled that a trial court's determination concerning whether the opponent of the peremptory challenge has satisfied the ultimate burden of proving purposeful discrimination is a question of fact that is reviewed for clear error." *Knight*, 473 Mich at 344. "The trial court's findings are clearly erroneous if, after we have reviewed the entire record, we are definitely and firmly convinced that it made a mistake." *People v Armstrong*, 305 Mich App 230, 237; 851 NW2d 856 (2014).

## 2. APPLICABLE LAW

"A prosecutor violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution when he or she uses a peremptory challenge to remove a prospective juror solely because of the juror's race." *Id.* at 237. "The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Flowers v Mississippi*, 588 US ___, ___; 139 S Ct 2228, 2244; 204 L Ed 2d 638 (2019). "In [*Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986)], the United States Supreme Court announced a three-step process for determining the constitutional propriety of a peremptory challenge." *Knight*, 473 Mich at 336.

---

analysis that relates in any way to whether the trial court properly decided the *Batson* issue. Sherrod was not permitted "to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *People v Bass*, 317 Mich App 241, 276; 893 NW2d 140 (2016) (quotation marks and citation omitted). "The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow." *Id.* (quotation marks and citation omitted). Thus, Sherrod has abandoned this issue on appeal and we need not address it. *Id.* However, because Adams has raised the same issue in his brief on appeal, we are required to consider the merits of the argument to the extent it coincides with Adams's arguments. Notably, though, Adams only argues that the prosecution committed racial discrimination in exercising its peremptory strikes. Sherrod, in his statement of question presented, also argued that there was gender discrimination evidenced in the prosecution's use of peremptory strikes. While the *Batson* framework has been extended to apply to alleged gender discrimination, *Flowers v Mississippi*, 588 US ___, ___; 139 S Ct 2228, 2243; 204 L Ed 2d 638 (2019) ("*Batson* now applies to gender discrimination . . . ."), Sherrod's utter lack of briefing on this issue has rendered it unreviewable. For example, Sherrod has not identified the names or juror numbers for any potential juror that he believes was discriminated against because of their gender. Absent even such basic information, we have no choice but to consider this issue abandoned and decline to address it. *Bass*, 317 Mich App at 276.

For the first step, Adams was required to "make a prima facie showing that (1) he or she is a member of a particular racial group, (2) the prosecution used a peremptory challenge to exclude from the jury a member of that racial group, and (3) the circumstances raise an inference that the challenge was race based." *Tennille*, 315 Mich App at 61. The first step in this case, however, has been rendered moot by the prosecution's offer of race-neutral reasons and the trial court's ultimate acceptance of those reasons. As our Supreme Court noted, "if the proponent of the challenge offers a race-neutral explanation and the trial court rules on the ultimate question of purposeful discrimination, the first *Batson* step (whether the opponent of the challenge made a prima facie showing) becomes moot." *Knight*, 473 Mich at 338, citing *Hernandez v New York*, 500 US 352, 359; 111 S Ct 1859; 114 L Ed 2d 395 (1991). Thus, our analysis focuses solely on the second and third steps in *Batson*.

During the second step in a *Batson* analysis, "the prosecutor may rebut the defendant's prima facie case with a race-neutral reason for dismissing the juror." *Armstrong*, 305 Mich App at 238. "Step two obliges the prosecutor to give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenges." *Tennille*, 315 Mich App at 63 (quotation marks and citation omitted). "*Batson*'s second step does not demand articulation of a persuasive reason, or even a plausible one; so long as the reason is not inherently discriminatory, it suffices." *Id*. (quotation marks and citation omitted).

In the third step, "[t]he trial judge must determine whether the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination." *Flowers*, 588 US at ___; 139 S Ct at 2241. This Court provided the following discussion regarding the analysis required in the third step of *Batson*:

> In *Miller-El v Cockrell*, 537 US 322, 338-339; 123 S Ct 1029; 154 L Ed 2d 931 (2003), the United States Supreme Court emphasized that "the critical question in determining whether a [defendant] has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike . . . . [T]he issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible." The Court provided several measures of credibility: "the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Id*. at 339. In making a finding at step three, the trial court is required to assess the plausibility of the race-neutral explanation "in light of *all* evidence with a bearing on it." *Miller-El v Dretke*, 545 US 231, 251-252; 125 S Ct 2317; 162 L Ed 2d 196 (2005) (emphasis added). [*Tennille*, 315 Mich App at 64 (second alteration in original).]

Importantly, a trial court may not "perfunctorily accept a race-neutral explanation without engaging in further investigation," but rather, "must undertake to find facts." *Id*. at 65 (quotation marks and citation omitted).

### 3. ANALYSIS

The trial court did not err when it denied Adams's *Batson* challenges.

Adams's argument first focuses on the prosecution's use of a peremptory strike against prospective juror HF. During voir dire, HF reported that her father had practiced as a criminal defense attorney for 15 years and she had friends who had been arrested during a political protest. Subsequently, the prosecution used a peremptory strike to excuse HF. After jury selection was complete, the trial court heard arguments regarding defendants' *Batson* challenge, which specifically addressed HF. Defendants asserted that the prosecution had apparently stricken HF from the jury "without any special justification," but because she was black. The prosecution contended that the actual reason was HF's involvement in political protests and having been raised by a criminal defense attorney. After considering the arguments, the trial court found that it agreed with the prosecution, noting that HF's association and potential involvement in political protests "portrays a political or ideological[] point of view," which allowed the prosecutor to "justifiably find [it] not in his interest" to keep HF.

Recall that, for the second step, the prosecution was only required to give a race-neutral reason for dismissing the challenged juror. *Tennille*, 315 Mich App at 63. Here, the prosecution cited that HF was the daughter of a criminal defense attorney, and participated in political protests with her friends. The prosecution also cited HF's demeanor while answering those questions. Adams does not seriously contend that those reasons were not race-neutral;[5] instead, he challenges the trial court's belief of those claims as the real reason for HF's dismissal. Consequently, the second step of the *Batson* analysis was properly determined to have been met. *Tennille*, 315 Mich App at 63.

Adams makes certain specific arguments regarding whether the trial court clearly erred in believing the prosecution's reasons for striking HF, the first of which is that the prosecution wrongly asserted that HF actually participated in the political protests. Indeed, on appeal, the prosecution agrees that the trial prosecutor slightly misstated the record, acknowledging that HF only said her friends participated in the political protest, not HF herself. Even so, the United States Supreme Court has been clear that "the back and forth of a *Batson* hearing can be hurried, and prosecutors can make mistakes when providing explanations." *Flowers*, 588 US at ___; 139 S Ct at 2250. Thus, such a mistake by the prosecution "is entirely understandable, and mistaken explanations should not be confused with racial discrimination." *Id*. Despite that, the Court was clear that "when considered with other evidence of discrimination, a series of factually inaccurate explanations for striking black prospective jurors can be telling." *Id*. In this case, Adams has identified only a single factual misstatement by the trial prosecutor. Further, it was a relatively minor misstatement where HF did specifically state that her friends had been involved in such

---

[5] To the extent Adams has attempted to make such an argument, it is without merit. As noted earlier, the standard for providing a race-neutral reason for striking a juror is exceedingly low. Indeed, we have noted that the second *Batson* step "does not demand articulation of a persuasive reason, or even a plausible one; so long as the reason is not inherently discriminatory, it suffices." *Tennille*, 315 Mich App at 63 (quotation marks and citation omitted). The prosecution's assertion that the reasons for using a peremptory on HF were "not inherently discriminatory," but rather, were because she was engaged in a political protest with friends, had a father who was a criminal defense attorney, and exhibited a questionable demeanor. Given the low bar for the second step of *Batson*, any argument by Adams in that regard is without merit. *Tennille*, 315 Mich App at 63.

protests. Under these circumstances, it was not clearly erroneous for the trial court to believe that the prosecution was concerned about HF's potential involvement in political protests that would suggest an ideology that was antiprosecution, as opposed to being solely concerned about her race. *Tennille*, 315 Mich App at 64, citing *Miller-El*, 537 US at 338-339.

Although not specifically cited by the trial court, that understanding of HF's potential antiprosecution sentiment was buttressed by HF's statement that her father had been a criminal defense attorney for 15 years. Adams also takes issue with that explanation in this appeal, citing HF's statement that she could still be fair even though her father was a criminal defense attorney. Notably, however, the prosecution also mentioned HF's demeanor while answering the questions, which suggested that the prosecution might not have believed HF's statement that she could be impartial despite having a criminal defense attorney for a father. The United States Supreme Court has been clear that, in regards to a *Batson* challenge, "[a] prosecutor is entitled to disbelieve a juror's *voir dire* answers . . . ." *Foster v Chatman*, 578 US ___, ___; 136 S Ct 1737, 1753; 195 L Ed 2d 1 (2016). Indeed, if the prosecution was required to take every voir dire answer at face value, then the system of peremptory strikes would be unnecessary in such instances because a for-cause strike would be in order where a juror said she could not be fair and impartial. The trial court decided to believe the prosecution's explanation for using a peremptory strike on HF, and the record reveals no reason for us to be "definitely and firmly convinced that [the trial court] made a mistake." *Armstrong*, 305 Mich App at 237. Thus, there was no clear error. *Id*.

Next, Adams argues that the trial court clearly erred when accepting the prosecution's use of a peremptory strike against TN. When prompted by the trial court, TN reported that she had "a cousin and uncle that's been in prison for life for killing somebody." TN also stated that she visited her uncle in prison and that she just graduated from high school last year. The prosecution ultimately used a peremptory strike to excuse TN from the jury. After the jury was selected and left the room, defendants asserted that TN was peremptorily excused from the jury because of her race. In response, the prosecution claimed that TN had been removed from the jury because she was too young to take such a significant case seriously enough, and because she had family in the system whom she visited. The trial court once again considered the arguments of the parties and found that the prosecution was telling the truth about the race-neutral reasons for striking TN from the jury.

As discussed, the second step of the *Batson* analysis requires only that the prosecution give reasons that are not inherently discriminatory on the basis of race. *Tennille*, 315 Mich App at 63. Here, the prosecution's proposed reasons—that TN had family in the prison system whom she visited and she was too young and inexperienced—are race-neutral. Considering the low bar for establishing this second step, the prosecution's reasons were sufficient. *Id*.

Adams's primary argument is in regards to the third step of the *Batson* analysis, which required the trial court "to determine whether the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination." *Flowers*, 588 US at ___; 139 S Ct at 2241. Adams first argues that the prosecution's reason regarding TN's age was obviously pretextual because other jurors were of a similar age were allowed to remain on the jury. It is true that "[w]hen a prosecutor's 'proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack panelist who is permitted to serve, that is evidence tending to prove purposeful discrimination.' " *Id*. at ___; 139 S Ct at 2248-2249, quoting *Foster*, 578 US at ___;

136 S Ct 1754.  Adams has not, however, referred us to any other jurors who were similarly aged and not excused from jury services.  "As the appellant," Adams "bore the burden of furnishing the reviewing court with a record to verify the factual basis of any argument upon which reversal was predicated." *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000).  Having failed to cite this Court to any factual basis for his argument, Adams did not meet that burden.  *Id*.  This is likely because Adams's bare assertion *is not* supported by the record.  Indeed, prospective juror KB also informed the trial court that she had just graduated from high school.  Like TN, KB was excused by the prosecution through the use of a peremptory strike.  Thus, Adams's assertion that the trial court clearly erred by refusing to consider the prosecution's disparate treatment of similarly-situated black and nonblack prospective jurors lacks factual support and merit.  *Flowers*, 588 US at ___; 139 S Ct at 2248-2249.

Adams also attacks the prosecution's proffered reason that TN had family members who were in prison, and whom she visited.  Once again, Adams asserts there were similarly-situated nonblack jurors who were permitted to stay on the jury despite having family members in prison.  As noted, the disparate treatment of black and nonblack jurors that have similar circumstances is evidence of purposeful discrimination.  *Id*.  Adams specifically cites the prosecution's treatment of prospective juror DJ, who informed that trial court that she had two brothers who were "serving natural life in prison."  DJ also stated, however, that she was a retired Michigan Department of Corrections (MDOC) officer, having worked as one for 25 years.  DJ said she believed both of her brothers had been tried fairly and that she could fairly consider the present case.  She was not asked, and therefore did not say, whether she visited her brothers in prison.

In light of that, the record reveals that DJ and TN did share one common circumstance—they both had relatives in prison.  Besides that, however, they were strikingly different.  TN had just graduated high school, while DJ was retired after working for 25 years.  TN stated that she visited one of her relatives in prison, DJ did not indicate one way or the other.  As noted by the prosecution on appeal, the fact that DJ worked as an MDOC officer was enough to show, in the eyes of the prosecution, that she was more likely to consider the case fairly, rather than be biased because of her jailed relatives.  Given this important distinction, as well as the age difference, it was not clearly erroneous for the trial court to believe the prosecution's proffered reasons for dismissing TN because of her age and existing relationship with relatives in prison.  *Flowers*, 588 US at ___; 139 S Ct at 2248-2249.

Adams also argues that the prosecution's failure to clarify whether DJ visited her imprisoned relatives was evidence of the prosecution's purposeful discrimination.  Adams's assertion finds some support in the law where the United States Supreme Court has said that the prosecution's "disparate questioning can be probative of discriminatory intent."  *Id*. at ___; 139 S Ct at 2247.  In *Flowers*, the Court noted that a black prospective juror who was ultimately peremptorily struck was asked "18 follow-up questions about her relationship with [the defendant's] family and with witnesses in the case," while five white jurors with similar relationships were not asked any follow-up questions.  *Id*.  This case, however, can be easily distinguished from *Flowers*, because in this case, the trial court asked all of the voir dire questions and did not permit the prosecution or defense counsel to ask questions.  Thus, Adams's allegation that the prosecution exhibited purposeful bias by failing to ask follow-up questions of DJ is not supported by the record.  It was the trial court that did not ask the questions, and the prosecution was required to act on the information that it had—DJ was older, more experienced, and possibly

did not visit her relatives in prison, while TN was young, inexperienced, and visited at least one of her relatives in prison. Considering the lack of evidence of disparate questioning, *id*., Adams has not provided any meritorious reason for us to determine that the trial court clearly erred in accepting the prosecution's race-neutral reasons for excusing TN, *Armstrong*, 305 Mich App at 237.

The last challenge by Adams relates to the prosecution's decision to peremptorily strike prospective juror AP. When questioned by the trial court, AP reported that he was single, did not have any kids, had never sat on a jury, and his education included some college courses. AP was dismissed on the basis of that information alone. When prompted for a race-neutral reason for excusing AP, the prosecution stated that AP's eyes were closed behind his sunglasses when the trial court was giving information or asking questions to other potential jurors. It was also noted that AP was young and appeared disinterested. The trial court agreed with the prosecution's description of AP and found the race-neutral reasons to be valid.

First addressing the second prong of the *Batson* analysis, it is clear that the prosecution provided race-neutral reasons for dismissing AP. Specifically, the prosecution cited AP having his eyes closed while the trial court was speaking, which showed a lack of focus. It was also noted that AP was young and potentially disinterested. As is obvious from that description of the reasons, there was nothing inherently discriminatory. *Tennille*, 315 Mich App at 63.

With regard to the third step of the *Batson* analysis, Adams argues the trial court clearly erred in accepting the prosecution's reasons, which were pretextual. Once again, Adams asserts that the prosecution's reliance on AP's age was obviously untrue because there were other young jurors. As discussed earlier, the record actually supports that many, if not all, of the younger jurors were excused by the prosecution's use of peremptory strikes. Therefore, this argument lacks merit. *Flowers*, 588 US at ___; 139 S Ct at 2248-2249. Absent that argument, the record does not contain any indication why the trial court's determination that the prosecution actually relied on the race-neutral reason for excusing AP was clearly erroneous. Indeed, in *Rice v Collins*, 546 US 333, 341; 126 S Ct 969; 163 L Ed 2d 824 (2006), the United States Supreme Court held that the prosecution's "wariness of the young and the rootless could be seen as race neutral," reasoning that a prosecutor could reasonably "remain[] worried that a young person with few ties to the community might be less willing than an older, more permanent resident to impose a lengthy sentence for possessing a small amount of a controlled substance." While the crime committed here was far more serious than the defendant's conviction of drug possession in *Rice*, the fear that a younger juror might not fully appreciate the gravity of the situation still remains true in this case. *Id*. This is especially compelling in this case where, in addition to being young, the prosecution and the trial court agreed that AP was mentally checked-out of the proceedings. Consequently, the trial court's acceptance of the prosecution's race-neutral reasons for dismissing AP has not resulted in our being "definitely and firmly convinced that [the trial court] made a mistake." *Armstrong*, 305 Mich App at 237. Thus, there was no clear error. *Id*.

In addition to all of the reasons already cited, it is important to note that the final jury proportions were about evenly split between black and nonblack jurors, as reported by the trial court. While it is true that "[t]he Constitution forbids striking even a single prospective juror for a discriminatory purpose," *Flowers*, 588 US at ___; 139 S Ct at 2244, it is also relevant that the prosecution did not undertake to entirely eliminate all of the potential black jurors. Indeed, this

Court has held that evidence that "the prosecutor failed to exercise all his peremptory challenges despite the fact that one African-American juror remained on the panel . . . is strong evidence against a showing of discrimination." *People v Eccles*, 260 Mich App 379, 387-388; 677 NW2d 76 (2004) (quotation marks and citation omitted). In this case, the prosecution expressed satisfaction with the jury despite having some peremptory strikes at its disposal. That evidence further supports the trial court's conclusion that the prosecution was not relying on race when dismissing potential jurors. *Id*. Thus, there was no clear error in this case, and consequently, no *Batson* violation.

## B. PREARREST SILENCE

Adams argues the trial court committed plain error requiring reversal when it allowed testimony about Adams's failure to turn himself in for questioning to police in violation of his constitutional right to remain silent. Alternatively, Adams argues that his trial counsel was ineffective for failing to object to that evidence. We disagree on both accounts.

### 1. PRESERVATION AND STANDARD OF REVIEW

"To preserve this claim of error for appellate review, [the] defendant had to object before the trial court and specify the same ground for objection that he asserts on appeal . . . ." *People v Clark*, ___ Mich App ___, ___; ___ NW2d ___ (2019) (Docket No. 343607); slip op at 10. Here, it is undisputed that Adams did not object to the testimony regarding his failure to turn himself in to police after contacting Officer Morris. Thus, this issue is not preserved for our review. *Id*. As to Adams's alternative argument, in order to preserve an argument that his trial counsel was ineffective, Adams was required to "move the trial court for a new trial or a *Ginther*[6] hearing." *People v Jackson (On Reconsideration)*, 313 Mich App 409, 431; 884 NW2d 297 (2015). It is undisputed that Adams never moved the trial court for a new trial or for a *Ginther* hearing. Consequently, this argument is not preserved for our review. *Id*.

Generally, "constitutional issues are reviewed de novo." *People v Shafier*, 483 Mich 205, 211; 768 NW2d 305 (2009). However, this Court "reviews the effect of an unpreserved constitutional error under the plain-error standard." *Id*. "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To show that a defendant's substantial rights were affected, there must be "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (citation omitted).

As to Adams's alternative argument, "[a]ppellate review of an unpreserved argument of ineffective assistance of counsel, like this one, is limited to mistakes apparent on the record." *People v Johnson*, 315 Mich App 163, 174; 889 NW2d 513 (2016). "The denial of effective

---

[6] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

assistance of counsel is a mixed question of fact and constitutional law, which are reviewed, respectively, for clear error and de novo." *People v Schrauben*, 314 Mich App 181, 189; 886 NW2d 173 (2016), quoting *People v Brown*, 279 Mich App 116, 140; 755 NW2d 664 (2008).

## 2. LAW AND ANALYSIS

There was no error in admitting the testimony regarding Adams's failure to turn himself in to police after speaking with Officer Morris. Because of that, Adams's trial counsel was not ineffective for failing to object to the constitutionally appropriate testimony.

Adams argues his constitutional right to remain silent was violated by allowing testimony about his failure to turn himself in to police for questioning. "The Fifth Amendment guarantees an accused the right to remain silent during his criminal trial and prevents the prosecution for commenting on the silence of a defendant who asserts the right." *Jenkins v Anderson*, 447 US 231, 235; 100 S Ct 2124; 65 L Ed 2d 86 (1980). "[A] criminal defendant's Fifth Amendment right under the United States Constitution against compelled self-incrimination . . . has been made applicable to the states through the Due Process Clause of the Fourteenth Amendment." *People v Borgne*, 483 Mich 178, 184; 768 NW2d 290 (2009). "A defendant's constitutional right to remain silent is not violated by the prosecutor's comment on his silence before custodial interrogation and before *Miranda*[7] warnings have been given." *People v McGhee*, 268 Mich App 600, 634; 709 NW2d 595 (2005). More specifically, where a "defendant's silence or non-responsive conduct did not occur during a custodial interrogation situation [or] in reliance on the *Miranda* warnings," such silence is "not a constitutionally protected silence." *People v Schollaert*, 194 Mich App 158, 166; 486 NW2d 312 (1992). Stated differently, a "defendant's right to due process is implicated only where his silence is attributable to either an invocation of his Fifth Amendment right or his reliance on the *Miranda* warnings." *People v Solmonson*, 261 Mich App 657, 664-665; 683 NW2d 761 (2004). Thus, a "defendant's constitutional rights [are] not violated when evidence of [such] silence [is] admitted as substantive evidence." *Schollaert*, 194 Mich App at 167.

In the present case, Officer Morris testified that Adams reached out to him when Adams became aware that the police were looking for him. Officer Morris contacted Detective Rutledge, who was the officer-in-charge of the case. Detective Rutledge asked Officer Morris to tell Adams that he should turn himself in to police for questioning. Officer Morris testified the information from Detective Rutledge was passed on to Adams. Despite having that information, Adams did not turn himself in for questioning. At trial, Detective Rutledge recalled that process via his testimony. He also stated that Adams went to Tennessee instead of turning himself in. Detective Rutledge testified the police used the cell phone location information for Adams and his wife to find Adams's location. Once found, Detective Rutledge alerted the United States Marshalls to bring Adams into custody. Detective Rutledge stated that Adams was arrested in Tennessee without incident and then sent to Michigan to await the present trial.

In this appeal, Adams contends the testimony by Detective Rutledge and Officer Morris was a violation of Adams's constitutional right to remain silent. However, binding caselaw requires the opposite conclusion because Adams's silence in this case was not entitled to

---

[7] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

constitutional protection. As this Court held in *Solmonson*, 261 Mich App at 664-665, Adams's "right to due process is implicated only where his silence is attributable to either an invocation of his Fifth Amendment right or his reliance on the *Miranda* warnings." As is clear from the record, Adams never invoked his Fifth Amendment right to remain silent and was never given *Miranda* warnings. More, this Court in *McGhee*, 268 Mich App at 634, held that a defendant's "constitutional right to remain silent is not violated by the prosecutor's comment on his silence before custodial interrogation and before *Miranda* warnings have been given." As already noted, Adams had not been provided *Miranda* warnings. Further, the record also shows that Adams was not the subject of a custodial interrogation when he allegedly decided to remain silent and go to Tennessee. Indeed, at that point, the only police officer Adams had spoken to was Officer Morris, who was Adams's family friend, and those conversations were initiated by Adams and took place over the telephone. Considering that Adams did not invoke his right to remain silent, was not the subject of a custodial interrogation, and had not been given *Miranda* warnings, his silence was "not a constitutionally protected silence." *Schollaert*, 194 Mich App at 166. In other words, Adams's "constitutional rights were not violated when evidence of his silence was admitted as substantive evidence." *Id*. at 167.

Adams alternatively argues that his trial counsel was ineffective for failing to object to the testimony that violated his constitutional right to remain silent. As discussed, Detective Rutledge and Officer Morris presented testimony that Adams did not turn himself in for questioning by the police after being requested to by Detective Rutledge. Adams's trial counsel did not object to that testimony. In the preceding analysis, however, we determined there was no error in admitting the testimony about Adams's silence. Consequently, any objection by Adams's trial counsel to that testimony would have been overruled as without merit. As we have held, "[f]ailing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Savage*, 327 Mich App 604, 617; 935 NW2d 69 (2019) (quotation marks and citation omitted). Thus, for the same reasons that the underlying claim regarding Adams's constitutional right to remain silent failed, so must his argument that his trial counsel was ineffective for failing to object to that alleged error. *Id*. Consequently, neither ground stated in this issue by Adams has merit nor requires reversal. *Id*.; *Schollaert*, 194 Mich App at 166-167.

## C. JURY INSTRUCTIONS

Adams argues that the trial court erred when it gave a voluntary-manslaughter instruction as a lesser included offense of first-degree premeditated murder for Sherrod, but not for Adams. We decline to address Adams's argument because Adams waived review of this issue by expressly approving the jury instructions.

"[I]ssues for appeal must be preserved in the record by notation of objection . . . ." *People v Carter*, 462 Mich 206, 214; 612 NW2d 144 (2000). A failure to properly object to an issue forfeits that issue, but does not extinguish the error; instead, it allows for plain-error review. *Id*. at 215-216. See also *Carines*, 460 Mich at 763. Waiver, however, occurs when a defendant "affirmatively approve[s]" of an issue before the trial court, only to later argue that there was error on appeal. *Jackson*, 313 Mich App at 420. When waiver occurs, unlike forfeiture, the error is extinguished. *Carter*, 462 Mich at 215.

When the trial court indicated that it would give the lesser included offense instruction for Sherrod but not Adams, there was no objection on the record. Then, after reading the final instructions to the jury, the trial court asked Adams and Sherrod if they approved of the instructions as read. Adams responded in the affirmative. Considering the affirmative approval of the trial court's instructions by Adams's trial counsel, this issue has been waived, and consequently, the error extinguished. *Carter*, 462 Mich at 215; *Jackson*, 313 Mich App at 420.

## III. DOCKET NO. 347434

### A. PROSECUTORIAL MISCONDUCT[8]

Sherrod argues that the prosecution committed misconduct requiring reversal by attack Sherrod's credibility during the prosecution's closing argument. We disagree.

### 1. PRESERVATION AND STANDARD OF REVIEW

In cases alleging prosecutorial misconduct, issues are "preserved by contemporaneous objections and requests for curative instructions . . . ." *People v Mullins*, 322 Mich App 151, 172; 911 NW2d 201 (2017) (quotation marks and citation omitted). Sherrod did not object to the alleged incidents of prosecutorial misconduct or request curative instructions during trial. Thus, those allegations are not preserved for our review. *Id*. "Claims of prosecutorial misconduct are generally reviewed de novo to determine whether the defendant was denied a fair trial." *People v Dunigan*, 299 Mich App 579, 588; 831 NW2d 243 (2013). However, because this issue has not been preserved for review, this Court must review the "unpreserved claim for plain error affecting defendant's substantial rights." *People v Roscoe*, 303 Mich App 633, 648; 846 NW2d 402 (2014). The plain-error standard has been described earlier in this opinion.

### 2. LAW AND ANALYSIS

Sherrod argues that the prosecutor committed misconduct requiring reversal by attacking Sherrod's credibility during closing arguments. "Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "We must evaluate instances of prosecutorial misconduct on a case-by-case basis, reviewing the prosecutor's [actions] in context and in light of the defendant's arguments." *People v Lane*, 308 Mich App 38, 62-63; 862 NW2d 446 (2014). "Generally, '[p]rosecutors are accorded great latitude regarding their arguments and conduct.' " *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995) (citation omitted; alteration in original). "They are free to argue the evidence and all reasonable inferences from the evidence as it relates to [their] theory of the case." *Id*. (quotation marks and citation omitted; alteration in original). In making those arguments, "[t]he prosecutor need not speak in the blandest of all possible terms." *People v Blevins*, 314 Mich App 339, 355; 886 NW2d 456 (2016) (quotation marks and citation omitted). " '[A] prosecutor may

---

[8] We employ the phrase "prosecutorial misconduct" as a term of art synonymous with "prosecutorial error," not as an indication that the prosecution engaged in intentional misconduct. *Jackson*, 313 Mich App at 425 n 4.

not make a statement of fact to the jury that is unsupported by the evidence . . . .' " *People v Ericksen*, 288 Mich App 192, 199; 793 NW2d 120 (2010) (alteration in original), quoting *People v Schumacher*, 276 Mich App 165, 178; 740 NW2d 534 (2007).

As noted, Sherrod argues the prosecutor committed misconduct by attacking the credibility of his testimony during trial. Specifically, Sherrod challenges certain portions of the prosecutor's closing argument, the first of which was the following statement made after the prosecutor summarized Sherrod's trial testimony: "That's what he wants you to believe, ladies and gentlemen, we're going to talk about that later on. But think about that when you consider the testimony of Mr. Sherrod as you move forward. And who is he protecting and why?" Then, before completing the closing argument, the prosecutor once again commented on Sherrod's testimony:

> And these two worked together. That's what the evidence shows. Mr. Sherrod was there for Mr. Adams and you can tell that when he was up here, ladies and gentlemen, you assess his credibility.

> I tell you and I argue and I submit to you now, he was covering for Mr. Adams, based on all the lies you've seen. All the lies and he comes up with this story to you and expect you to believe it.

> I'm asking you to believe the facts and I think when you do that, when you assess the facts and you assess the motive and you assess the credibility of everyone you see in this chair, you will find the verdict and that verdict will be guilty of murder one, because that's what this is.

Sherrod's argument on appeal is premised on his understanding of the law that the prosecutor was not permitted to attack his credibility unless the defense first attacked the credibility of the prosecution's witnesses.

Sherrod's argument is not founded upon Michigan caselaw. Indeed, in *People v Howard*, 226 Mich App 528, 548; 575 NW2d 16 (1997), this Court held that while a prosecutor is not permitted to vouch for the credibility of their witnesses, or to "suggest that the government has some special knowledge that the witness is testifying truthfully," the prosecutor "may [] argue from the facts that a witness is credible or that the defendant or another witness is not worthy of belief." More specifically, the *Howard* panel reasoned that it was not misconduct for the prosecutor to "advance[e] his position that various claims by [the] defendant were not credible in light of contradictory evidence adduced at trial." *Id.* Our Supreme Court has held similarly, stating that "[i]t is well established that the prosecutor may comment upon the testimony and draw inferences from it and may argue that a witness, including the defendant, is not worthy of belief." *People v Buckey*, 424 Mich 1, 14-15; 378 NW2d 432 (1985).

In the present case, the prosecutor merely noted the jury was entitled to consider whether Sherrod's testimony was credible, and should account for the various contradictory evidence that was introduced at trial. Further, the prosecutor also noted the almost absurd nature of Sherrod's testimony—that he was somehow able to shoot two different guns, including a long rifle like an AR-15 and a handgun, and use the rifle to shoot his own hand. The prosecutor argued to the jurors that they should consider whether Sherrod's version of events was more credible, or whether it

was more likely that Adams was the person shooting the AR-15 and accidentally shot Sherrod's hand. The prosecutor also commented on Sherrod's motive to lie—he was extremely close to Adams as a friend. The prosecutor never said anything that would have indicated to the jury that the prosecutor had some special knowledge about the veracity of Sherrod's testimony. Instead, the prosecutor merely urged the jury to consider Sherrod's questionable credibility in light of all of the evidence admitted at trial. As this Court stated in *Howard*, 226 Mich App at 548, and our Supreme Court held in *Buckey*, 424 Mich at 14-15, the prosecutor did not commit misconduct by making those arguments. Thus, this argument by Sherrod was on the basis of a clear misstatement of the law, and consequently, is without merit. *Id.*

Finally, to the extent that any of the prosecutor's arguments could have been considered improper, they were minor enough to not affect Sherrod's substantial rights under a plain-error analysis. *Carines*, 460 Mich at 763. This is especially true here, where the trial court instructed the jury that "the lawyers' statements and arguments are not evidence. They're only meant to help you understand the evidence and each side's legal theories. You should only accept things the lawyers have said that are supported by the evidence or by your own commonsense." "Jurors are presumed to follow the court's instructions, and instructions are presumed to cure most errors." *Mullins*, 322 Mich App at 173. Consequently, any minor error potentially committed by the prosecutor was cured by the instruction, and thus, did not prejudice Sherrod or necessitate reversal of his convictions. *Carines*, 460 Mich at 763; *Mullins*, 322 Mich App at 173.

## B. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Sherrod, in both the brief on appeal filed by his appellate counsel and his Standard 4 brief, argues that he was provided constitutionally ineffective assistance of counsel requiring reversal. We disagree.[9]

---

[9] As it relates to Sherrod's Standard 4 brief on appeal, the alleged grounds for finding ineffective assistance of trial counsel have not been adequately, or even minimally, briefed. Indeed, besides providing a list of alleged failures by his trial counsel, Sherrod has not provided any citation to the record, caselaw, statutes, or court rules. Sherrod was not permitted "to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Bass*, 317 Mich App at 276 (quotation marks and citation omitted). "The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow." *Id.* (quotation marks and citation omitted). Thus, Sherrod has abandoned these issues in his Standard 4 brief on appeal and we will not address it. *Id.* Even so, we have reviewed the record and, to the extent we could discern Sherrod's arguments, we have found that they lacked merit.

Additionally, in his Standard 4 brief on appeal, Sherrod contends that he was denied the effective assistance of appellate counsel. While Sherrod actually presents an argument regarding this issue, we decline to consider it because it has been rendered moot. Since filing his Standard 4 brief, Sherrod's original appellate counsel withdrew from the case, and Sherrod was appointed new appellate counsel, who filed a replacement brief on behalf of Sherrod. Sherrod does not make

## 1. PRESERVATION AND STANDARD OF REVIEW

To preserve an argument that his trial counsel was ineffective, Sherrod was required to "move the trial court for a new trial or a *Ginther* hearing." *Jackson*, 313 Mich App at 431. It is undisputed that Sherrod never moved the trial court for a new trial or for a *Ginther* hearing. While Sherrod moved this Court to remand the case for a *Ginther* hearing, he did not move the trial court for such relief. Further, this Court denied defendant's motion for remand and a *Ginther* hearing was never conducted. *People v Sherrod*, unpublished order of the Court of Appeals, entered March 3, 2020 (Docket No. 347434). Thus, this issue is not preserved for our review. *Jackson*, 313 Mich App at 431.

In regards to the issue of ineffective assistance of counsel, despite moving for a remand in this Court, "because no *Ginther* hearing was held, our review is limited to mistakes apparent on the record." *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009). "The denial of effective assistance of counsel is a mixed question of fact and constitutional law, which are reviewed, respectively, for clear error and de novo." *Schrauben*, 314 Mich App at 189, quoting *Brown*, 279 Mich App at 140.

## 2. LAW AND ANALYSIS

Sherrod has failed to establish that trial counsel provided ineffective assistance of counsel.

"Criminal defendants have a right to the effective assistance of counsel under the United States and Michigan Constitutions." *Schrauben*, 314 Mich App at 189-190, citing US Const, Am VI; Const 1963, art 1, § 20. "However, effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *Schrauben*, 314 Mich App at 190. The United States Supreme Court has held that "in order to receive a new trial on the basis of ineffective assistance of counsel, a defendant must establish that 'counsel's representation fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for

---

any argument that his new appellate counsel ineffectively represented him during this appeal. "It is well established that a court will not decide moot issues." *People v Smith*, 502 Mich App 624, 631; 918 NW2d 718 (2018) (quotation mark and citation omitted). "This is because it is the principal duty of this Court . . . to decide actual cases and controversies." *People v Richmond*, 486 Mich 29, 34; 782 NW2d 187 (2010) (quotation marks and citation omitted; alteration in original), amended 784 NW2d 204 (2010). "A dispute is moot if no controversy exists and any judgment on the matter would lack practical legal effect." *Smith*, 502 Mich at 631. Further, "[a]n issue is [also] moot when an event occurs that renders it impossible for the reviewing court to fashion a remedy to the controversy." *People v Kavanaugh*, 320 Mich App 293, 308; 907 NW2d 845 (2017), quoting *People v Cathey*, 261 Mich App 506, 510; 681 NW2d 661 (2004). "Courts will not entertain such abstract issues unless they are of public significance and are likely to recur, yet may evade judicial review." *Smith*, 502 Mich at 631-632 (quotation marks and citation omitted). Because Sherrod was already provided new appellate counsel, there is no relief we could provide for him under this issue, and thus, it is moot. *Id*. at 631. Further, where none of the exceptional circumstances apply that would potentially warrant review of this issue, we decline to consider it. *Id*. at 631-632.

-16-

counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012), quoting *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "When reviewing defense counsel's performance, the reviewing court must first objectively 'determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.' " *Jackson*, 313 Mich App at 431, quoting *Strickland*, 466 US at 690. "Next, the defendant must show that trial counsel's deficient performance prejudiced his defense—in other words, that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Jackson*, 313 Mich App at 431, quoting *Vaughn*, 491 Mich at 669.

We will not find trial counsel to be ineffective where an objection would have been futile; nor will we second-guess matters of trial strategy. *People v Thomas*, 260 Mich App 450, 457; 678 NW2d 631 (2004); *People v Rockey*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999). "The defendant 'bears the burden of demonstrating both deficient performance and prejudice[;] the defendant [also] necessarily bears the burden of establishing the factual predicate for his claim.' " *People v Cooper*, 309 Mich App 74, 80; 867 NW2d 452 (2015) (alteration in original), quoting *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

Sherrod first argues his trial counsel was ineffective for failing to request a severance of the trial in a timely manner. The first question we must consider is whether such a request would have been granted. "On a defendant's motion, the court must sever the trial of defendants on related offenses on a showing that severance is necessary to avoid prejudice to substantial rights of the defendant." MCR 6.121(C). However, "[t]here is no absolute right to separate trials, and in fact, '[a] strong policy favors joint trials in the interest of justice, judicial economy, and administration.' " *People v Bosca*, 310 Mich App 1, 44; 871 NW2d 307 (2015) (second alteration in original), quoting *People v Harris*, 201 Mich App 147, 152; 505 NW2d 889 (1993). "Severance should be granted when defenses are antagonistic." *Bosca*, 310 Mich App at 44. However, "[i]nconsistency of defenses is not enough to mandate severance; rather, the defenses must be mutually exclusive or irreconcilable." *People v Hana*, 447 Mich 325, 349; 524 NW2d 682 (1994) (quotation marks and citation omitted), amended sub nom *People v Gallina*, 447 Mich 1203 (1994). "In other words, the 'tension between defenses must be so great that a jury would have to believe one defendant at the expense of the other.' " *Bosca*, 310 Mich App at 44, quoting *Hana*, 447 Mich at 349. "Moreover, [i]ncidental spillover prejudice, which is almost inevitable in a multi-defendant trial, does not suffice." *Hana*, 447 Mich at 349 (quotation marks and citation omitted; alteration in original).

Sherrod argues his trial counsel's timely motion for severance would have been granted. However, the record reveals otherwise. At trial, Sherrod's defense was that the victim reached for a gun, Sherrod feared for his life, and shot the victim in self-defense. Sherrod testified regarding those facts during the trial and stated that Adams was not involved. Likewise, Adams's defense was that he was not at all involved in the shooting. These defenses, as is clear from their mere description, are not mutually exclusive or irreconcilable. Indeed, the defenses are not even inconsistent. Rather, the defenses fit perfectly with each other: Sherrod testified that he acted alone, and Adams stated that he was not involved. Considering that Sherrod's and Adams's defenses are not mutually exclusive or irreconcilable, the trial court would not have granted a timely motion for severance filed by Sherrod's trial counsel. *Bosca*, 310 Mich App at 44.

In an effort to escape that conclusion, Sherrod argues that his being tried together with Adams resulted in his jury hearing testimony that Adams fled to Tennessee instead of turning himself in for questioning. Sherrod contends that this testimony was prejudicial to his case, because it undermined his testimony that he acted alone. Sherrod's argument apparently relies on the inference that Adams would not have gone to Tennessee if he was not involved in the shooting, thereby belying Sherrod's defense. The passing relevance of that argument telegraphs its failure. As our Supreme Court held, "[i]ncidental spillover prejudice, which is almost inevitable in a multi-defendant trial, does not" warrant severance. *Hana*, 447 Mich at 349 (quotation marks and citation omitted; alteration in original). Besides the limited evidence of Adams's flight from Michigan to Tennessee, Sherrod has not identified any other legitimate and prejudicial evidence that would have been excluded from his trial. Considering the minor nature of that evidence, it simply was not possible that the trial court would have severed the cases for trial. *Id*. Consequently, any objection by Sherrod's trial counsel would not have been granted, and thus, would have been futile. *Id*. We will not find trial counsel to be ineffective for failing to make a futile objection. *Savage*, 327 Mich App at 617.

Next, Sherrod argues his trial counsel was ineffective for failing to object to the prosecutor's misconduct during closing argument. Specifically, Sherrod contends that his trial counsel should have objected when the prosecutor improperly attacked Sherrod's credibility during closing argument. However, as was discussed earlier in this opinion, the prosecutor's arguments regarding Sherrod's credibility were not improper. The prosecutor was permitted to assert that Sherrod's testimony was belied by other evidence admitted at trial, and thus, was not credible. Consequently, any objection by Sherrod's trial counsel to that argument by the prosecutor would have been overruled. As we have held, "[f]ailing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *Id*. (quotation marks and citation omitted). Therefore, this argument also lacks merit.

## C. OTHER-ACTS EVIDENCE

Sherrod argues the trial court abused its discretion by admitting evidence that Sherrod was involved in another fatal shooting on Cadieux Road ("the Cadieux shooting") under MRE 404(b). We disagree.

## 1. STANDARD OF REVIEW

"When the issue is preserved, we review a trial court's decision to admit evidence for an abuse of discretion, but review de novo preliminary questions of law, such as whether a rule of evidence precludes admissibility." *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *People v Buie*, 491 Mich 294, 320; 817 NW2d 33 (2012). "[W]hen such preliminary questions of law are at issue, it must be borne in mind that it is an abuse of discretion to admit evidence that is inadmissible as a matter of law." *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999).

-18-

## 2. GENERAL LAW

In Michigan, MRE 404(b) regulates the admissibility of evidence of "[o]ther crimes, wrongs, or acts . . . ." Indeed, MRE 404(b)(1) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." The Michigan Supreme Court explained that "MRE 404(b) 'is a rule of legal relevance' that 'limits only one category of logically relevant evidence': '[i]f the proponent's only theory of relevance is that the other act shows defendant's inclination to wrongdoing in general to prove that the defendant committed the conduct in question, the evidence is not admissible.' " *People v Jackson*, 498 Mich 246, 258; 869 NW2d 253 (2015) (alteration in original), quoting *People v VanderVliet*, 444 Mich 52, 61-63; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994). "Underlying the rule is the fear that a jury will convict the defendant inferentially on the basis of his bad character rather than because he is guilty beyond a reasonable doubt of the crime charged." *People v Watkins*, 491 Mich 450, 468; 818 NW2d 296 (2012), quoting *People v Crawford*, 458 Mich 376, 384; 582 NW2d 785 (1998). MRE 404(b), however, "is not exclusionary, but is inclusionary, because it provides a nonexhaustive list of reasons to properly admit evidence that may nonetheless also give rise to an inference about the defendant's character." *People v Mardlin*, 487 Mich 609, 616; 790 NW2d 607 (2010). That "nonexhaustive list of reasons" includes "proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case." MRE 404(b)(1).

Even where evidence is considered to be relevant under MRE 401 and admissible under MRE 404(b), the evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." MRE 403. Notably, MRE 403 does not regulate evidence that is simply "prejudicial" because "[r]elevant evidence is inherently prejudicial." *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995) (citation omitted), mod 450 Mich 1212 (1995). Rather, "[i]t is only when the probative value is *substantially outweighed* by the danger of unfair prejudice that evidence is excluded." *Id*. There is, therefore, a two-part test:

> [T]his Court must make two distinct inquires under the balancing test of MRE 403. First, this Court must decide whether introduction of [the] evidence at trial was unfairly prejudicial. Then, this Court must apply the balancing test and weigh the probativeness or relevance of the evidence against the unfair prejudice. [*People v Cameron*, 291 Mich App 599, 611; 806 NW2d 371 (2011) (quotation marks and citation omitted).]

"Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008). Stated differently, the "major function [of MRE 403] is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Mills*, 450 Mich at 75 (citation omitted). Such concerns arise where "the tendency of the proposed evidence [is] to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock." *Cameron*, 291 Mich App at 611 (quotation marks and citation omitted). Additional concerns include "the danger of confusion of

the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Watkins*, 491 Mich at 489 (quotation marks and citation omitted).

## 3. ANALYSIS

In the present case, Sherrod challenges evidence admitted by the prosecution regarding Sherrod's involvement in a separate fatal shooting on the same day of the shooting that led to the present case. Specifically, the prosecution was permitted to ask Sherrod about the circumstances of the Cadieux shooting and to admit portions of the video of his interview with police, during which he admitted certain relevant facts. At trial during cross-examination, in the interview video played to the jury, and in his written statement, Sherrod claimed the he used the same Glock 17 handgun that was used in this case to shoot at two people in the Cadieux shooting. While Sherrod did not actually connect with his two targets in the Cadieux shooting, an innocent bystander was shot and killed. The shooting took place about one hour before the incident that led to the present case. When asked by police why he shot at the two men in the Cadieux shooting, Sherrod explained that he had been in an argument with one of the men. Sherrod testified that he believed that man went back to his apartment to retrieve a gun. Although Sherrod admitted he never saw that man with a gun, Sherrod testified he saw "indications" of a gun. Upon seeing that "indication," Sherrod opened fire on the man's apartment. When he saw an associate of the man on the street corner, Sherrod also shot at the associate. It was while shooting at the associate on the corner that Sherrod shot and killed an innocent bystander. Like in the present case, Sherrod claimed that he feared for his life and thought his only option was to shoot in self-defense.

Our Supreme Court has directed that the first step in analyzing admissibility of other-acts evidence under the rules of evidence requires consideration of whether "the evidence [was] offered for a proper purpose under Rule 404(b) . . . ." *VanderVliet*, 444 Mich at 55. The prosecution presented, and the trial court accepted, several noncharacter purposes for that evidence. "Of these theories, only one needs to be a proper, noncharacter reason that compels admission for the testimony to be admissible." *People v Starr*, 457 Mich 490, 501; 577 NW2d 673 (1998). The most relevant noncharacter reason for this appeal was that it was extremely unlikely that Sherrod would be involved in two fatal shootings in about the span of an hour that were necessitated by self-defense. The highly unlikely nature of the occurrences tended to prove Sherrod's state of mind, or intent, when shooting at the victim in this case. Specifically, the evidence was probative of whether Sherrod actually believed his life was in danger when he shot and killed the victim in this case. This is a proper purpose under MRE 404(b), because Sherrod's intent is included in the list of such purposes in MRE 404(b)(1), and because our Supreme Court has held that MRE 404(b) evidence can be admitted to rebut the defendant's version of events presented at trial. *Jackson*, 498 Mich at 276 (holding that MRE 404(b) evidence "was offered for the proper, nonpropensity purpose of . . . counter[ing] the defendant's theory that the complainant's allegations of abuse were fabricated . . . ."); *Starr*, 457 Mich at 502 ("Thus, we find the proffered evidence to be probative to refute the defendant's allegations of fabrication of charges.").

The second step in analyzing other-acts evidence requires consideration of "the legal relevance of the evidence in light of" the stated purpose for its admission. *People v Kelly*, 317 Mich App 637, 644; 895 NW2d 230 (2016). "Under the second prong of the *VanderVliet* test, logical relevance is determined by the application of MRE 401 and MRE 402." *People v Denson*,

500 Mich 385, 400; 902 NW2d 306 (2017). "We have emphasized the importance of logical relevance, calling it the 'touchstone' of the admissibility of other-acts evidence." *Id*. "Relevance is a relationship between the evidence and a material fact at issue that must be demonstrated by reasonable inferences that make a material fact at issue more probable or less probable than it would be without the evidence." *Crawford*, 458 Mich at 387. "Other-acts evidence is logically relevant if two components are present: materiality and probative value." *Denson*, 500 Mich at 401.

Although the prosecution and the trial court never specifically stated it, the logical relevance in this case they relied on was the doctrine of chances. "The doctrine of chances—also known as the doctrine of objective improbability—is a theory of logical relevance [that] does not depend on a character inference." *Mardlin*, 487 Mich at 616 (quotation marks and citation omitted; alteration in original). "Michigan has long recognized the doctrine of chances, which provides that rare or unusual events that occur frequently in relation to a single person are less likely to have an innocent explanation and more likely to demonstrate the probability of an *actus reus*." *People v Breidenbach*, 489 Mich 1, 12; 798 NW2d 738 (2011). "Rather than relying on the subjective character of the defendant, it relies on the objective improbability of so many accidental or unexplained events of a similar nature befalling one individual." *Id*. at 12 n 23. This theory of logical relevance requires the prosecution to "make persuasive showings that each uncharged incident is similar to the charged offense and that the accused has been involved in such incidents more frequently than the typical person." *Crawford*, 458 Mich at 395 (quotation marks and citation omitted).

In the present case, Sherrod testified that he shot and killed the victim because he saw the victim reaching for a gun in his waistband while walking aggressively toward Sherrod's car. He asked the jury to believe that he feared for his life and acted out of self-defense. To rebut that testimony, the prosecution admitted evidence that Sherrod asserted self-defense in a fatal shooting that occurred just one hour before the events in this case. In both cases, there was a verbal argument that at least passively involved Sherrod—in this case, the active participant in the argument was Adams, who Sherrod was good friends with. In both cases, the argument ended and one side left the area—in the Cadieux shooting, the unknown man returned to his apartment; in the present case, Adams and Sherrod drove away from the liquor store. Within 10 minutes of separating, the parties to both arguments met once again at the spot of the original argument. Sherrod testified that, in both instances, he believed he saw a man with a gun, or at least an "indication" of a gun; believed his life was in danger; feared for his safety; and shot his Glock 17 handgun at the people as an act of self-defense.

As is evident from those descriptions of the two events, the "uncharged incident is similar to the charged offense . . . ." *Id*. (quotation marks and citation omitted). More importantly, they were similar in a way that is logically relevant to the fact at issue in the present case—whether Sherrod actually acted in self-defense. It was highly improbable that Sherrod would face two situations where he had to shoot a gun in self-defense in the matter of an hour. This supported the prosecution's assertion that Sherrod had "been involved in such incidents more frequently than the typical person." *Id*. (quotation marks and citation omitted). Thus, the evidence fit within the doctrine of chances, *id*., and made it more likely that Sherrod did not actually shoot the victim because Sherrod feared for his life. In other words, the evidence was probative of a material fact at issue in the case that was unrelated to criminal propensity, which means that it was logically

relevant to the prosecution's stated purpose for introduction of the MRE 404(b) evidence—Sherrod's intent. *Denson*, 500 Mich at 401.

The third prong of the test for admissibility of other-acts evidence under *VanderVliet*, 444 Mich 55, questions whether, under MRE 403, the evidence should be excluded because the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. Undoubtedly, admitting evidence that Sherrod shot and killed an innocent bystander presented at least some danger of unfair prejudice. It was within the realm of probability that the evidence would elicit "the jury's bias, sympathy, anger, or shock." *Cameron*, 291 Mich App at 611 (quotation marks and citation omitted). Even so, this Court is tasked with determining whether the trial court abused its discretion in determining that the obvious danger of unfair prejudice *substantially outweighed* the probative value of the evidence. MRE 403. As discussed, the evidence in question was logically relevant to the single most important issue to Sherrod's case—whether he acted in self-defense. Other than introducing evidence that no one saw the victim with a gun in this case, the prosecution was limited in its ability to challenge Sherrod's state of mind when he decided to shoot the victim. Relevantly, the victim was outside the view of the surveillance cameras on the liquor store when the shooting occurred. Thus, there was no clear view of the victim's actions before he was shot.

The evidence that Sherrod had claimed self-defense arising out of a fatal shooting that occurred just one hour before the events of this case provided significant probative value regarding whether Sherrod's self-defense claim was true. While there was a danger that the jury would draw a criminal propensity inference from the evidence, it was still important for the jury to hear that Sherrod had claimed self-defense arising out of two instances that occurred an hour apart. This made it more likely that Sherrod was merely claiming self-defense when such was not actually true. The jury was properly permitted to consider the unlikely probability that Sherrod would face that situation twice in an hour, bringing the veracity of his claim into significant doubt. The trial court determined that the significant probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. At best for Sherrod, the issue was close, and because "a trial court's decision on a close evidentiary question ordinarily cannot be an abuse of discretion," this Court should defer to the trial court's decision. *People v Hine*, 467 Mich 242, 250; 650 NW2d 659 (2002).

The last prong of the *VanderVliet* test is to consider whether the trial court gave a limiting instruction. *Kelly*, 317 Mich App at 644. In the instant case, the trial court did provide a limiting instruction, upon the request of Sherrod, regarding the permitted use of other-acts evidence. Specifically, the trial court instructed the jury that they could not consider the evidence to determine that Sherrod is a bad person or that he was likely to commit crimes. Further, the jury was informed that it must not convict Sherrod because it believed Sherrod committed a crime in the Cadieux shooting. "Jurors are presumed to follow the court's instructions, and instructions are presumed to cure most errors." *Mullins*, 322 Mich App at 173. Thus, any possibility that unfair prejudice was caused by evidence of the Cadieux shooting, it was cured by the trial court's limiting instruction. *Id*. In sum, the trial court did not abuse its discretion in admitting the evidence of the Cadieux shooting under MRE 404(b).

## D. JUROR MISCONDUCT

Sherrod, in his Standard 4 brief on appeal, argues the trial court erred when it failed to dismiss a juror, RS, who was sleeping through portions of the trial. Alternatively, he argues his trial counsel was ineffective for failing to request the dismissal of the juror. We disagree.

The first problem with Sherrod's argument is that he has failed to brief it, and thus, abandoned it. Besides stating that RS should not have been permitted to stay on the jury, and that trial counsel was ineffective for failing to request RS's dismissal, Sherrod has not made any argument on appeal. Indeed, Sherrod has not cited to the record, caselaw, statutes, or court rules supporting his position that reversal is warranted because of RS's alleged sleeping. Sherrod was not permitted "to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Bass*, 317 Mich App at 276 (quotation marks and citation omitted). "The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow." *Id*. (quotation marks and citation omitted). Thus, Sherrod has abandoned this issue on appeal and we need not address it. *Id*.

Even so, because the issue is generally discernible from the record provided, we have reviewed it. Considering that these issues are not preserved, we must analyze the underlying issue—whether the allegedly sleeping juror should have been dismissed—under the plain-error framework, *Carines*, 460 Mich at 763, and the ineffective assistance of counsel argument for errors that are apparent on the record, *Payne*, 285 Mich App at 188. The burden for proving juror misconduct requiring reversal is high, as discussed by this Court in *Dunigan*, 299 Mich App at 586:

> An allegation of juror misconduct, even if the alleged misconduct did actually occur, will not warrant a new trial unless the party seeking the new trial can show " 'that the misconduct [was] such as to affect the impartiality of the jury or disqualify them from exercising the powers of reason and judgment.' " *People v Nick*, 360 Mich 219, 230; 103 NW2d 435 (1960) (citation omitted). Simply put, the record does not reveal any such egregiousness. Indeed, the record reveals, contrary to [the] defendant's assertion, that only one juror had been observed to be sleeping. The trial court properly admonished the juror, but there is no indication of what, if any, testimony the juror missed. More importantly, [the] defendant fails to articulate how he was prejudiced. He only makes the bare assertion that the juror could not fairly and competently consider the charges against him and therefore was not qualified to give a verdict. Based on the entire record of this trial, [the] defendant fails to demonstrate that this assertion has any basis in fact.

In this case, like in *Dunigan*, Sherrod fails to make any allegation regarding what testimony the sleeping juror purportedly missed. Consequently, Sherrod has not presented grounds for us to reverse his convictions, especially considering this issue is unpreserved, and thus, Sherrod was required to prove prejudice. *Carines*, 460 Mich at 763.

Pertinently, the defendant in *Dunigan*, 299 Mich App at 586, like Sherrod in this case, also argued that his trial counsel was ineffective for failing to request the dismissal of the sleeping juror. Once again, the *Dunigan* Court's analysis applies to this case as well:

> [The d]efendant sought a remand for an evidentiary hearing under *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973), concerning his counsel's ineffectiveness; however, because this Court denied defendant's motion, review is limited to mistakes apparent on the record. *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007). Among other things, a defendant must at a minimum establish that any mistake made by counsel prejudiced the defendant, meaning there is a reasonable probability that the proceedings would have had a different outcome if counsel had not made the alleged error. See *People v Carbin*, 463 Mich 590, 599-600, 623 NW2d 884 (2001). Once again, [the] defendant has not shown that the sleeping juror affected the outcome of the proceedings. Furthermore, assuming the juror missed any testimony, it would have been testimony from the prosecution's witnesses; defense counsel could reasonably have made a strategic decision to assume that the juror's missing that testimony would have helped the defense. This Court will "neither substitute[] its judgment for that of counsel regarding matters of trial strategy, nor make[] an assessment of counsel's competence with the benefit of hindsight." *People v Matuszak*, 263 Mich App 42, 58; 687 NW2d 342 (2004). Accordingly, [the] defendant was not denied effective assistance of counsel when defense counsel did not move for the exclusion of Juror No. 119 from the jury. [*Dunigan*, 299 Mich App at 586-587.]

In the present case, the trial court noted that RS had been sleeping through parts of trial before Sherrod, the only witness for the defense, started testifying. Thus, the only purported evidence of RS sleeping was during the prosecution's witnesses. In light of that fact, like in *Dunigan*, it was likely that Sherrod's trial counsel thought it best to leave a juror who might have slept through potentially damaging evidence provided by the prosecution, which was not objectively unreasonable trial strategy. *Id.* Most importantly, though, Sherrod has not provided any proof that the outcome of his trial would have been different if RS had been excused from the jury, rendering his ineffective assistance of counsel argument without merit under the second prong of *Strickland*, 466 US at 694.

In sum, this issue has been abandoned by Sherrod's utter failure to brief it, and even if he had briefed it, there would have been no grounds for reversal.[10]

---

[10] Sherrod's Standard 4 brief on appeal also contains various references to an array of constitutional rights, without any attempt to actually express what issues are being challenged. For the reasons stated throughout this opinion, all of those alleged errors have been abandoned on appeal because we have not been provided with sufficient argument to determine exactly what is being challenged. Thus, to the extent any issue purportedly raised by Sherrod in his Standard 4 brief on appeal has not been specifically mentioned in this opinion, we have deemed it abandoned. *Bass*, 317 Mich App at 276.

## IV. CONCLUSION

We affirm Adams's and Sherrod's convictions and Adams's sentences, but remand for the ministerial task of correcting, or clarifying, Sherrod's judgment of sentence. We do not retain jurisdiction.

/s/ James Robert Redford
/s/ Patrick M. Meter
/s/ Colleen A. O'Brien