# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

   Plaintiff-Appellee/Cross-Appellant,

v

MARTI J. SCHRAUBEN,

   Defendant-Appellant/Cross-
   Appellee.

FOR PUBLICATION
January 26, 2016
9:00 a.m.

No.  323170
Ionia Circuit Court
LC No.  2012-015535-FH

Before:  MARKEY, P.J., and OWENS and RONAYNE KRAUSE, JJ.

OWENS, J.

Defendant appeals as of right his jury trial convictions of eight counts of uttering and publishing, MCL 750.249, four counts of forgery, MCL 750.248, and four counts of a fraudulent insurance act, MCL 500.4511.  He was sentenced to serve nine months in jail for the forgery convictions, 11 months in jail for the uttering and publishing convictions, and 16 months in prison for the fraudulent insurance acts convictions.  The jury also convicted defendant of one count of conducting a criminal enterprise (CCE), MCL 750.159i(1), one count of receiving the proceeds of a criminal enterprise (CCE proceeds), MCL 750.159i(3), and eight counts of embezzlement, MCL 750.174, which the trial court dismissed when it granted defendant's motion for directed verdict of acquittal.  Plaintiff cross-appeals the trial court's order granting defendant's motion for directed verdict of acquittal.  We affirm defendant's convictions and sentences and the trial court's order granting defendant's motion for directed verdict of acquittal.

Defendant and Michael Lehman jointly owned two funeral homes in Portland and Ionia, where they sold prepaid funeral plans.  In 2005, Lehman bought out defendant's shares in the business and defendant began to operate a country club.  Lehman testified that he and his wife discovered some financial irregularities after defendant left, but they did not give them much consideration.  In December 2007, defendant talked to Lehman about returning to work for the funeral homes as an employee, which Lehman agreed to, but testified that defendant was not allowed to have any direct financial responsibilities.  According to Lehman, if a customer arranged for a prepaid funeral plan with defendant, Lehman was to handle the transaction, which included bank deposits.  Lehman managed the Portland chapel while defendant worked at the Ionia chapel.

-1-

Lehman testified that after defendant had been working at the Ionia chapel for at least two years, he learned defendant had been making deposits himself, which caused Lehman to investigate further. Lehman discovered that customers who had intended to purchase prepaid funeral plans had actually written checks to Schrauben Management, which was a holding company for the country club owned by defendant and had nothing to do with the funeral home business. In addition, several of the escrow accounts and insurance policies used to fund the prepaid funerals had been paid out before the deaths of the individuals who had purchased those plans. According to Lehman, his name was forged on checks originally made payable to the funeral home and then signed over to Schrauben Management.

Defendant first argues on appeal that the trial court abused its discretion by denying defendant's motion for a new trial based on Lehman's perjured testimony. We review the trial court's decision to deny defendant's motion for a new trial for an abuse of discretion. *People v Cress*, 468 Mich 678, 691; 664 NW2d 174 (2003).

The trial court held an evidentiary hearing to address the perjury allegations against Lehman, where many inconsistencies in Lehman's testimony were exposed. Defendant argues that these inconsistencies show Lehman perjured himself and warrant a new trial. "It is well settled that a conviction obtained through the knowing use of perjured testimony offends a defendant's due process protections guaranteed under the Fourteenth Amendment." *People v Aceval*, 282 Mich App 379, 389; 764 NW2d 285 (2009). "If a conviction is obtained through the knowing use of perjured testimony, it 'must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *Id.*, quoting *United States v Agurs*, 427 US 97, 103; 96 S Ct 2392; 49 L Ed 2d 342 (1976).

Defendant does not explain how the prosecutor knowingly presented perjured testimony, and, as the trial court found, there is no evidence that the prosecutor knew about the potential perjury. Even if the prosecutor knowingly presented perjured testimony, the false testimony likely would not have affected the judgment of the jury. While the inconsistencies exposed at the evidentiary hearing certainly cast doubt on Lehman's testimony at trial and raised questions as to his involvement in the fraud, there was other evidence that implicated defendant's guilt. Specifically, the undersheriff discovered approximately 65 checks in the Schrauben Management bank account, maintained by defendant, which came from funeral home clients or the insurance companies. Information taken from defendant's home computer, specifically the Quickbooks program, matched the checks found in the Schrauben Management bank account. The manager of defendant's country club testified that she would often enter deposits into Quickbooks for defendant, and large deposits were commonly allocated under "membership dues." Evidence showed that these large deposits coincided with the checks that were deposited into the Schrauben Management bank account from the funeral home. Further, two funeral home clients testified that they were directed by defendant to write a check to Schrauben Management when they purchased prepaid funeral policies. The defense's theory at trial was that Lehman was giving the money to Schrauben to pay the debt he owed him for the buyout, but this does not explain why defendant would direct two clients to write their checks to Schrauben Management. Finally, defendant, not Lehman, was the one on trial, and even if the jury were aware that Lehman was involved, it likely would not change the verdict against defendant.

Additionally, although this Court has not specifically ruled on whether a defendant may be entitled to a new trial irrespective of the prosecutor's culpability, it has stated that "it is the 'misconduct's effect on the trial, not the blameworthiness of the prosecutor, [which] is the crucial inquiry for due process purposes.' " *Aceval*, 282 Mich App at 390, quoting *Smith v Phillips*, 455 US 209, 220 n 10; 102 S Ct 940; 71 L Ed 2d 78 (1982) (alteration in *Aceval*). The focus "must be on the fairness of the trial, not on the prosecutor's or the court's culpability." *Id*. Therefore, "a conviction will be reversed and a new trial will be ordered, but only if the tainted evidence is material to the defendant's guilt or punishment." *Id*. at 389.

Defendant argues that the inconsistencies in Lehman's testimony are material to defendant's guilt because they show that Lehman was the actual perpetrator. As discussed, however, there was concrete evidence presented which implicated defendant, despite the level of Lehman's potential involvement. Although Lehman was a key witness at trial, the deposits into the Schrauben Management bank account maintained by defendant and the records on defendant's home computer strongly implicated defendant, even without Lehman's testimony. Therefore, we conclude that the trial court did not abuse its discretion by denying defendant's motion for a new trial based on perjury.

Defendant next argues that trial counsel was ineffective for failing to introduce exculpatory evidence and develop testimony that would have shown Lehman testified falsely. "The denial of effective assistance of counsel is a mixed question of fact and constitutional law, which are reviewed, respectively, for clear error and de novo." *People v Brown*, 279 Mich App 116, 140; 755 NW2d 664 (2008).

Criminal defendants have a right to the effective assistance of counsel under the United States and Michigan Constitutions. US Const, Am VI; Const 1963, art 1, § 20. However, effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012). To establish that a defendant's trial counsel was ineffective, a defendant must show: (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984); see also *Vaughn*, 491 Mich at 669.

Defendant argues that trial counsel was ineffective for failing to introduce exculpatory evidence and develop testimony regarding (1) the timing of Lloyd Dickinson's death, which led Lehman to discover defendant's wrongdoing, and errors on Dickinson's death certificate, (2) the fact that Lehman testified that he confirmed defendant's wrongdoing after visiting Independent Bank, when the banking was actually conducted at Firstbank, and (3) the fact that Lehman never filed claims for many clients that passed away before Lehman allegedly discovered the fraud, despite testimony that he had a tracking mechanism to ensure that he was paid by the escrow companies or the families. These alleged errors, however, do not show that trial counsel's performance fell below an objective standard of reasonableness. Trial counsel testified at the evidentiary hearing that he chose to focus on what he felt were much-larger issues than Dickinson's claim and was unaware of the Firstbank account that the Lehmans had. Trial counsel made it clear that, in hindsight, he could have highlighted other issues that cast doubt on Lehman's credibility, particularly the fact that Lehman never filed claims for other clients that

had passed away before he discovered the fraud. However, we will not second-guess counsel's trial strategy or assess his competence with the benefit of hindsight. *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). Defendant has failed to overcome the strong presumption that his counsel's trial strategy was sound, and therefore, has failed to prove that he received ineffective assistance of counsel. *Id.*

Defendant next argues that during her closing argument and rebuttal the prosecutor suggested to the jury that defense counsel was attempting to purposefully mislead the jury. Defendant forfeited this issue by failing to object at trial. *People v Fyda*, 288 Mich App 446, 460; 793 NW2d 712 (2010). Therefore, our review is for plain error affecting defendant's substantial rights. *Id.* at 460-461. "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 461.

Defendant specifically challenges the following statements made during the prosecutor's closing argument:

> *Mr. Hocking is a very skilled, excellent trial attorney. He's an excellent cross-examiner. He pulls things out of people and muddies up the water. And that's what we talk about when we are prosecutors. We say the defense attorney is going to come and throw mud up on the wall, except we don't use that word when we talk amongst ourselves. Let's see how muddy we can make this water so the jury can't really see what's going on here. Let's see what can we come up with? How about this? How about that? How about the other thing? Does that make sense? That's what defense attorneys do. I know. I'm married to one. You should be at our house sometimes.* They would like you to—the Defense would like you to believe that he was—that Mr. Lehman was conspiring with Mr. Schrauben about this; that that was going to pay off the buyout amount. And it happens to be around the same amount so they could make that argument. [Emphasis added.]

Defendant also challenges the following statements made during the prosecutor's rebuttal:

> Ladies and gentlemen, I asked you before to render a guilty verdict for each and every one of the counts that I have charged the defendant with. *And I will call Mr. Hocking a mud slinger and he's really good at it. He's very convincing. He's picking out every little thing that he could possibly think of that would try and create reasonable doubt, but it just doesn't make it.* I want you to look at the elements and the Judge is going to tell you, you can believe some things from a witness, one witness and not others from that witness. But you have to believe with [sic] to make my burden of proof, to find the defendant guilty is the elements of the offenses. Were the elements proved beyond a reasonable doubt? Not all this other stuff that he calls reasonable doubt. That's for you to make the call. I say it's not. I say it's mud. Thank you very much. I appreciate your very good attention. [Emphasis added.]

"Prosecutors are typically afforded great latitude regarding their arguments and conduct at trial[,]" *People v Unger*, 278 Mich App 210, 236; 749 NW2d 272 (2008), but "may not suggest that defense counsel is intentionally attempting to mislead the jury." *People v Watson*, 245 Mich App 572, 592; 629 NW2d 411 (2001). Such an argument implies that defense counsel does not believe his own client, which undermines the defendant's presumption of innocence. *Fyda*, 288 Mich App at 461.

In this case, the prosecutor's argument that defense counsel is a "mud slinger" who "pulls things out of people and muddies up the water," suggests that defense counsel was distracting the jury from the truth and deterring the jury from seeing the real issues. This argument is improper. See, e.g, *Watson*, 245 Mich App at 592 (holding that the prosecutor exceeded the bounds of proper argument by suggesting that defense counsel used "red herrings" to distract the jury from the truth).

However, the trial court instructed the jury that the attorneys' statements and arguments were not evidence and we presume that jurors follow their instructions. *Unger*, 278 Mich App at 237. Further, reversal is not warranted because any prejudicial effect created by the improper statements could have been alleviated by a timely objection and curative instruction. *Id.* at 238.

Defendant also argues that the cumulative effect of the earlier alleged errors denied him a fair trial. To warrant reversal based on cumulative error, "the effect of the errors must have been seriously prejudicial in order to warrant a finding that defendant was denied a fair trial." *People v Knapp*, 244 Mich App 361, 388; 624 NW2d 227 (2001). However, defendant only identified one error involving the prosecutor's improper argument, which could have been cured by a timely objection. Therefore, reversal is not warranted.

Defendant next argues that the trial court erred by not imposing an intermediate sanction for his fraudulent insurance act convictions. A trial court's decision to depart from the sentencing guidelines is reviewed for reasonableness. *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015).

Defendant's appropriate sentence range for his fraudulent insurance acts convictions entitled him to an intermediate sanction pursuant to MCL 769.34(4)(a), which provides,

(4) Intermediate sanctions *shall* be imposed under this chapter as follows:

(a) If the upper limit of the recommended minimum sentence range for a defendant determined under the sentencing guidelines set forth in chapter XVII is 18 months or less, *the court shall impose an intermediate sanction unless the court states on the record a substantial and compelling reason to sentence the individual to the jurisdiction of the department of corrections.* An intermediate sanction may include a jail term that does not exceed the upper limit of the recommended minimum sentence range or 12 months, whichever is less. [Emphasis added.]

Subsection (4)(a) requires the trial court to sentence defendant to an intermediate sanction that does not include prison time, absent a substantial and compelling reason for departure. See *Lockridge*, 498 Mich at 387 (stating that "shall" indicates a mandatory directive). However, our

Supreme Court in *Lockridge* specifically stated that any part of MCL 769.34 that refers to the guidelines as mandatory or refers to departures from the guidelines is severed or struck down. *Id.* at 365 n 1 ("To the extent that any part of MCL 769.34 or another statute refers to use of the sentencing guidelines as mandatory or refers to departures from the guidelines, that part or statute is also severed or struck down as necessary."). Accordingly, under *Lockridge*, a trial court is no longer required to impose an intermediate sanction.

Consistent with the remedy explained in *Lockridge*, we replace the word "shall" in MCL 769.34(4)(a) with the word "may." See *id.* at 391 (stating that to remove the mandatory directive of MCL 769.34(2), the Court need only substitute the word "may" for "shall"). Additionally, we strike down the requirement that a trial court must articulate substantial and compelling reasons to depart from an intermediate sanction. See *id.* (stating that under MCL 769.34(3), a trial court no longer needs to provide substantial and compelling reasons to depart from the applicable guidelines range). Pursuant to the broad language of *Lockridge*, under subsection (4)(a), a trial court may, but is no longer required to, impose an intermediate sanction if the upper limit of the recommended minimum sentence range is 18 months or less.

In this case, defendant first argues that the trial court's reasons for departing from an intermediate sanction were not substantial and compelling. However, as discussed, this is no longer a requirement following *Lockridge*.

Second, defendant argues that the trial court violated *Alleyne v United States*, 570 US ___; 133 S Ct 2152; 186 L Ed 2d 314 (2013), because the reasons used to justify an upward departure from the statutorily mandated intermediate sanction were not based on facts found beyond a reasonable doubt by the jury. However, because an intermediate sanction is no longer mandated pursuant to *Lockridge*, defendant's argument is without merit because *Alleyne* stands for the proposition that any fact that increases a *mandatory* minimum sentence must be submitted to the jury and found beyond a reasonable doubt. *Alleyne*, 570 US at ___; 133 S Ct at 2163. This "does not mean that any fact that influences judicial discretion must be found by a jury." *Id.* Now, pursuant to *Lockridge*, a trial court has discretion to impose an intermediate sanction if the upper limit of the recommended minimum sentence range is 18 months or less, but it is not required to.

In this case, defendant's recommended minimum sentence was zero to 17 months' imprisonment. The trial court sentenced defendant to 16 months in prison, which is within the range authorized by law. See *Alleyne*, 570 US at ___; 133 S Ct at 2163 (stating that a trial court has discretion to sentence a defendant within the range authorized by law). Where a trial court does not depart from the recommended minimum sentencing range, the minimum sentence must be affirmed unless there was an error in scoring or the trial court relied on inaccurate information. MCL 769.34(10).[1] Defendant does not dispute that his sentence was within the

---

[1] Notably, *Lockridge* did not alter or diminish MCL 769.34(10), which provides, in pertinent part, "If a minimum sentence is within the appropriate guidelines sentence range, the court of appeals shall affirm that sentence and shall not remand for resentencing absent an error in

-6-

recommended minimum guidelines range, and he does not argue that the trial court relied on inaccurate information or that there was an error in scoring the guidelines.[2]  Therefore, this Court must affirm the sentence.

Finally, defendant argues that the trial court erred by assessing 10 points for Offense Variable (OV) 4 for his uttering and publishing convictions.  We review for clear error the trial court's factual determinations, which must be supported by a preponderance of the evidence. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013).  We review de novo whether the factual determinations were sufficient to score OV 4.  *Id.*  See also *People v Steanhouse*, ___ Mich App ___; ___ NW2d ___ (2015); slip op at 19 (holding that because scoring the offense variables remains relevant under *Lockridge*, the standards of review traditionally applied to the trial court's scoring of the offense variables remain viable).

OV 4 requires the trial court to determine whether a serious psychological injury requiring professional treatment occurred to a victim.  MCL 777.34(1)(a).  The trial court may assess 10 points "if the serious psychological injury may require professional treatment."  MCL 777.34(2).  Defendant does not challenge the fact that Lehman, the victim, did not seek professional treatment, but rather argues that Lehman's psychological injury was not serious.

In this case, although the statement was not provided to this Court, defendant acknowledges that Lehman indicated in a letter to the trial court that "the past three years have been a struggle for him psychologically."  We have upheld a trial court's assessment of 10 points for OV 4 where the victim suffered "personality changes, anger, fright, or feelings of being hurt, unsafe, or violated."  *People v Armstrong*, 305 Mich App 230, 247; 851 NW2d 856 (2014).

Further, the trial court noted that based on its memory and the impression it got from trial, it "would be ignoring the obvious if [it] were to say that there were no signs or no evidence of serious psychological injury requiring professional treatment."  The trial court had the opportunity to observe Lehman's demeanor during trial and noted how the funeral home was his life and when defendant committed the crimes, everything changed for Lehman.  See *Steanhouse*, ___ Mich App at ___; slip op at 20 (discussing serious psychological injury as it relates to OV 5 and noting that the trial court's opportunity to observe the demeanor of the victim's family members supported its factual findings that they sustained psychological injury).  Accordingly, we conclude that the trial court's factual finding that Lehman suffered a serious psychological injury was not clearly erroneous and was supported by a preponderance of the evidence.  The evidence sufficiently demonstrates that Lehman suffered a serious psychological injury that may require professional treatment, and therefore, the trial court properly assessed 10 points for OV 4.

---

scoring the sentencing guidelines or inaccurate information relied upon in determining the defendant's sentence."

[2] Although defendant challenges the scoring of OV 4, as will be discussed later, that challenge relates to the scoring of the offense variables for his convictions of uttering and publishing, and not his convictions of fraudulent insurance acts.  The trial court scored the offense variables separately for each group of offenses.

In its cross-appeal, plaintiff argues that the trial court erred by granting defendant's motion for a directed verdict of acquittal and dismissing defendant's convictions for embezzlement, CCE, and CCE proceeds. In reviewing a trial court's decision regarding a motion for directed verdict, we review the evidence in a light most favorable to the prosecution to "determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Riley (After Remand)*, 468 Mich 135, 139-140, 659 NW2d 611 (2003).

On appeal, the parties only argue whether the money converted by defendant belonged to the funeral home to support the convictions for embezzlement under MCL 750.174, which in turn supports the convictions for CCE and CCE proceeds. Embezzlement by an agent or employee, MCL 750.174, requires proof of six elements:

(1) the money in question must belong to the principal, (2) the defendant must have a relationship of trust with the principal as an agent or employee, (3) the money must come into the defendant's possession because of the relationship of trust, (4) the defendant dishonestly disposed of or converted the money to his own use or secreted the money, (5) the act must be without the consent of the principal, and (6) at the time of conversion, the defendant intended to defraud or cheat the principal. [*People v Lueth*, 253 Mich App 670, 683; 660 NW2d 322 (2002).]

The Prepaid Funeral and Cemetery Sales Act provides that "all funds received in connection with a prepaid contract shall be held in escrow by an escrow agent for the benefit of the contract beneficiary." MCL 328.222(1). Funds are not disbursed until "the death of the contract beneficiary and upon performance by the provider of its obligation to furnish merchandise or funeral or cemetery services pursuant to the prepaid contract." MCL 328.222(11).

In this case, the money never belonged to the funeral home. The money belonged to the contract beneficiaries until their death and upon performance of the funeral home's obligations. Plaintiff argues that defendant's wrongful acts caused title to pass to the funeral home, and therefore, the money belonged to it. However, although the funeral home received checks from the insurance company, the money still did not belong to it. The money belonged to the contract beneficiaries until their death and upon performance of the funeral home's obligations, neither of which occurred at the time.

Additionally, the money did not come into defendant's possession "because of the relationship of trust." *Lueth*, 253 Mich App at 683. The money came into defendant's possession because he tricked the insurance companies into writing checks to the funeral home by filing false death claims. In discussing the difference between larceny and embezzlement, our Supreme Court has stated that with embezzlement "there must be an unlawful appropriation of that which comes into possession rightfully." *People v Bergman*, 246 Mich 68, 71; 224 NW 375 (1929). In this case, defendant did not come into possession of the money rightfully. Therefore, the trial court did not err by granting defendant's motion for a directed verdict of acquittal and dismissing defendant's convictions for embezzlement, CCE, and CCE proceeds, because the

money converted by defendant never belonged to his employer, the funeral home, as required by MCL 750.174.

Affirmed.

/s/ Donald S. Owens
/s/ Jane E. Markey