*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DEMETRIUS FITZGERALD JENKINS,

        Defendant-Appellant.

UNPUBLISHED
July 1, 2021

No. 351557
Lenawee Circuit Court
LC No. 18-019226-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DEMETRIUS FITZGERALD JENKINS,

        Defendant-Appellant.

No. 351558
Lenawee Circuit Court
LC No. 18-019227-FC

---

Before: GLEICHER, P.J., and CAVANAGH and LETICA, JJ.

PER CURIAM.

In Docket No. 351557, defendant appeals as of right his jury conviction on a count of delivery of a controlled substance causing death, MCL 750.317a, arising from the death of Milton Reynolds (Reynolds). In Docket No. 351558, defendant appeals as of right his jury conviction on a second count of delivery of a controlled substance causing death arising from the death of Joshua Torres (Joshua).[1] Defendant was sentenced to concurrent terms of 225 months' to 80 years' imprisonment. We affirm.

---

[1] The appeals were consolidated in this Court. *People v Jenkins*, unpublished order of the Court of Appeals, entered November 26, 2019 (Docket Nos. 351557 and 351558).

-1-

## I. FACTS

This matter began when four men—Reynolds, Joshua, Christopher Lee Torres (Christopher), and Josh Trevino (Trevino)—met at a bar, drank, and then decided to purchase cocaine. Reynolds contacted a dealer, whom the prosecution claimed was defendant. Christopher drove Reynolds to a nearby Fricker's restaurant, where Reynolds purchased the cocaine. They returned to the bar, and then went to Trevino's house. The cocaine looked odd; instead of being white, it was brownish. All four snorted it. As it turned out, what was sold to Reynolds contained heroin. Reynolds and Joshua died hours after using it, both having overdosed on heroin. Trevino and Christopher fell ill but survived. Christopher and various other witnesses testified at trial. The prosecutor also presented video evidence showing Reynolds and defendant alone at Fricker's for a short period of time. No evidence was presented showing the drug transaction. Ultimately, defendant was found guilty of both charges.

On appeal, defendant argues that: (1) the trial court should have granted his motion for a mistrial after Christopher provided objectionable testimony on three occasions; (2) the trial court erred by allowing the admission of a hearsay statement made by Reynolds in which he stated he was not feeling well and had "got[ten] a bag from" defendant; (3) the trial court erred by allowing a detective to provide expert "drug profile" testimony and then by failing to provide certain jury instructions regarding how to consider that testimony, and further, trial counsel was ineffective for failing to object to the testimony and request such instructions; (4) offense variable (OV) 5 was improperly scored; and (5) defendant's sentence—although within the guidelines—is disproportionate. We address each argument in turn.

## II. ANALYSIS

### A. MOTION FOR A MISTRIAL

Defendant first argues that the trial court abused its discretion when it denied a motion for a mistrial made by defendant shortly after Christopher began testifying. We disagree. A trial court's decision on a motion for a mistrial is reviewed for an abuse of discretion. *People v Dennis*, 464 Mich 567, 572; 628 NW2d 502 (2001). "An abuse of discretion occurs when the trial court renders a decision falling outside the range of principled decisions." *People v Rao*, 491 Mich 271, 279; 815 NW2d 105 (2012).

A trial court "should only grant a mistrial for an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial and when the prejudicial effect of the error cannot be removed in any other way." *People v Lane*, 308 Mich App 38, 60; 862 NW2d 446 (2014) (quotation marks and citations omitted). Generally, "unresponsive testimony by a prosecution witness does not justify a mistrial unless the prosecutor knew in advance that the witness would give the unresponsive testimony or the prosecutor conspired with or encouraged the witness to give that testimony[.]" *People v Jackson (On Reconsideration)*, 313 Mich App 409, 427; 884 NW2d 297 (2015) (quotation marks and citation omitted).

The motion for a mistrial was based on three instances where Christopher provided objectionable testimony.[2]  The first occurred after the prosecutor asked Christopher about what took place at the bar:

> *Q*.  Okay.  I'm sorry, then you said you started talking about getting some cocaine?
>
> *A*.  Yes.  Wanted to party a little, so we decided, you know, to get cocaine.  Actually, they decided, but I was gonna be the person to drive there.
>
> *Q*.  When you say they decided?
>
> *A*.  I'm sorry, Josh Trevino, Milton Reynolds, and my brother Josh, Joshua Torres, discussed about getting it.  So I said, you know, "Sure, why not?"  So Milton [Reynolds] texted who he knew, and at the time it would have been Mr. Jenkins.

The objectionable aspect of this testimony was the last portion, where Christopher identified defendant as the person Reynolds texted.  Defense counsel immediately objected, the objection was sustained, and the prosecutor then clarified with Christopher that he did not have any personal knowledge of whom Reynolds texted to obtain the cocaine.  Christopher testified that Reynolds "texted whoever he was texting to get the drugs from."

The second instance was soon after, when Christopher testified about what took place in the vestibule at Fricker's, and after he left the vestibule.  Notably, before the objectionable testimony was provided, the prosecutor explained to Christopher that he should not "testify about something you didn't see if you weren't there."  This was followed by this exchange:

> *A*.  No, I'm sayin' when I left.
>
> *Q*.  Okay.
>
> *A*.  Yeah, when I walked away, those two were the only ones that were in there.
>
> *Q*.  Okay.
>
> *A*.  So I went to the restroom.  After Milton [Reynolds] got the drugs or whatever, he came into the restroom –
>
> *Defense Counsel*:  Your Honor, I'm gonna object.  There's no foundation laid for that.  This is exactly what we talked about this morning.

---

[2] Below and on appeal, defendant has referred to all three objectionable responses as presenting hearsay problems.  But the first and second instances involve areas where Christopher testified to facts about which he lacked personal knowledge.  The third instance involves a hearsay statement.

The court sustained the objection, and the prosecutor then clarified with Christopher that he did not see "anything take place in the entryway at Fricker's . . . ." Defense counsel then asked for an instruction that the jury was to disregard testimony where an objection was made and sustained. The court gave that instruction.

The third instance, which caused defense counsel to ultimately move for a mistrial, occurred immediately after. The prosecutor asked Christopher who was in the bathroom with him, and Christopher explained that it was himself and Reynolds. The prosecutor then asked, "Then what happened?" Christopher stated, "He told me he had it." Before defense counsel could make a hearsay objection, the prosecutor stated, "No, wait, wait, wait." Counsel made his objection, which was that the hearsay statement ("He told me he had it") was ruled inadmissible before trial. Defense counsel then questioned how his client could receive a fair trial if Christopher were to keep "blurt[ing] out" hearsay evidence. Defense counsel ultimately moved for a mistrial based on Christopher's repeated statements of inadmissible testimony. That motion was denied.

The trial court did not abuse its discretion by denying the motion. As defense counsel himself noted while moving for a mistrial, there is simply no indication that the prosecutor knowingly or intentionally caused Christopher to provide inadmissible testimony. The first instance (where Christopher indicated that Reynolds texted defendant to purchase drugs without personal knowledge that this was true) was a volunteered statement. It was also entirely unrelated to the question posed by the prosecutor, which was a question asking Christopher to clarify who "they" were that discussed buying cocaine. The second instance (where Christopher indicated that Reynolds obtained drugs before joining Christopher in the restroom) was also a volunteered statement that was not responsive to the question asked. The prosecution had simply asked Christopher to explain what took place in the bathroom. And before Christopher had provided this testimony, the prosecutor had specifically explained to Christopher that he was not to testify to facts that he did not actually witness.

The third instance was when Christopher, in response to the question, "Then what happened?" stated, "He told me he had it." This statement had been the subject of a pretrial motion, and the trial court had ruled it inadmissible. Defendant argues on appeal that the prosecutor reasonably could have expected Christopher to provide the response he did. True, the prosecutor's question was fairly open-ended, and could possibly lead a witness to provide hearsay testimony. But the prosecutor seems to have been asking Christopher to explain events, not statements. There is certainly no evidence that the prosecutor knew in advance that Christopher would respond as he did, or that the prosecutor encouraged Christopher to provide hearsay testimony.

Ultimately, a mistrial should only be granted "for an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial and when the prejudicial effect of the error cannot be removed in any other way." *Lane*, 308 Mich App at 60. Here, there were three relatively minor irregularities. Each time, defense counsel objected, and the objections were sustained. The jury was instructed to disregard testimony if an objection to that testimony was sustained. Juries are presumed to follow their instructions, and instructions are presumed to cure most errors. *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011). And with regard to the first two instances of objectionable testimony, the prosecutor also immediately clarified that Christopher lacked personal knowledge and thus could not testify to whom Reynolds texted and about what occurred in the vestibule outside Christopher's presence. To the extent defense counsel

-4-

questioned whether he would be able to cross-examine Christopher, that issue appears to have been resolved; the prosecutor spoke with Christopher during a recess to clarify what he could and could not say in front of the jury, and there is no indication that defendant was then unable to effectively cross-examine Christopher. Indeed, on cross-examination, defense counsel further pointed out that Christopher lacked personal knowledge of whether Reynolds's text messages were sent to defendant, or whether Reynolds actually purchased drugs from defendant at Fricker's.

Under the circumstances, we cannot conclude that a mistrial was the only possible way to cure any prejudice to defendant. Rather, the court's instructions to the jury, the prosecutor's clarifying questions (and Christopher's responses), the prosecutor's discussion with Christopher, and defense counsel's thorough cross-examination of Christopher remedied any prejudice to defendant. The trial court thus did not abuse its discretion by denying the motion for a mistrial.

## B. HEARSAY EVIDENCE

Defendant next argues that the trial court abused its discretion when, before trial, the trial court ruled that a statement made by Reynolds to his live-in girlfriend, Shannon Martin—that he was feeling ill and "got a bag from Cisco"—was admissible as a present sense impression under MRE 803(1). We agree that the statement was not admissible under MRE 803(1). However, the admission of the statement was harmless.[3]

At issue is a statement made by Reynolds to Martin when he got home, in which he stated that he did not feel well and had "got[ten] a bag from Cisco." Clearly, this is a hearsay statement, as it is an out-of-court statement offered to prove the truth of the matter asserted. MRE 801(c). Below, the prosecutor argued in her written motion that the statement was admissible under the exception for present sense impressions, MRE 803(1), or alternatively, under the residual hearsay exception of MRE 803(24). At the motion hearing, the prosecutor took the same positions, and also argued that the statement was admissible as an excited utterance under MRE 803(2). Defendant agreed that the portion of the statement in which Reynolds described how he was feeling (i.e., that he was feeling ill) was admissible as a present sense impression. Defendant argued that the portion explaining where he acquired the drugs was not. The trial court ruled:

> Statement 3, Mr. Reynolds'[s] statement to Miss Martin that he was not feeling well is a present sense impression admissible under MRE 803(1), the connected statement that he bought a bag from Cisco and was not feeling well explains an event or condition of his illness made while the declarant was

---

[3] We note that while defendant's statement of the question presented on appeal asks whether defendant's constitutional rights to due process and to confront the witnesses against him were violated, the discussion of the issue raises no such concerns. Rather, the analysis presented by defendant presents only an evidentiary issue: whether the trial court erred by ruling that a hearsay statement was admissible as a present sense impression. To the extent defendant could be said to have raised any constitutional issues, those issues are abandoned as defendant has failed to brief them. See *People v Smith*, 439 Mich 954, 954; 480 NW2d 908 (1992), citing *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959).

perceiving the event or condition of his illness, therefore, statement 3 is admissible under MRE 803(1).

The hearsay exception for present sense impressions, MRE 803(1), is as follows: "A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." To admit a hearsay statement as a present sense impression, three conditions must be satisfied: "(1) the statement must provide an explanation or description of the perceived event [or condition], (2) the declarant must personally perceive the event [or condition], and (3) the explanation or description must be 'substantially contemporaneous' with the event." *People v Hendrickson*, 459 Mich 229, 236; 586 NW2d 906 (1998). Such statements "are presumed to be trustworthy because (1) the simultaneous event and description leave no time for reflection, (2) the likelihood for calculated misstatements is minimized, and (3) generally, the statement is made in the presence of another witness who has the opportunity to observe and verify its accuracy." *Id*. at 235 (footnote and citations omitted).

Defendant does not dispute that the portion of the statement regarding how Reynolds was feeling was admissible as a present sense impression, as that portion of the statement was (1) a description of a perceived condition (feeling ill), (2) Reynolds was personally perceiving the condition, and (3) the explanation was made while Reynolds was perceiving the condition. Rather, defendant argues that to the extent Reynolds told Martin that he "got a bag from Cisco," that event (obtaining drugs from Cisco) happened hours before, and thus, the statement was not substantially contemporaneous. We agree. The portion of the statement describing where Reynolds obtained the drugs does not describe an event or condition that was substantially contemporaneous to when the statement was made. It explained an event that occurred hours earlier—the drug purchase. While the prosecutor contends that the "event or condition" by which the contemporaneousness of the event should be measured is the feeling of being ill (brought on by consumption of the drugs), Reynold's statement that he "got a bag from Cisco" did not describe *that* event or condition. Rather, the statement that Reynolds "got a bag from Cisco" described an event that had occurred several hours in the past, and thus, was not "substantially contemporaneous" as required by MRE 803(1). Cf. *Hendrickson*, 459 Mich at 236-237 (recognizing that absolute contemporaneity is not always possible, and slight lapses of time are allowable; citing cases allowing 4- and 16-minute time lapses to suffice as "substantially contemporaneous").[4]

The prosecutor alternatively argues that the statement was admissible as an excited utterance, MRE 803(2). To be admissible as an excited utterance, two requirements must be met: there must be a startling event, and the resulting statement must be made while under the excitement caused by that event. *People v Smith*, 456 Mich 543, 550; 581 NW2d 654 (1998). "The rule allows hearsay testimony that would otherwise be excluded because it is perceived that a person who is still under the sway of excitement precipitated by an external startling event will

---

[4] Further, as it pertains to the statement that Reynolds obtained drugs from Cisco, none of the reasons why present sense impressions are deemed reliable exist. Reynolds had hours to reflect on the issue, leaving plenty of time to make a calculated misstatement had Reynolds wished to do so, and the statement was not made to someone who could verify its accuracy. See *Hendrickson*, 459 Mich at 235.

not have the reflective capacity essential for fabrication so that any utterance will be spontaneous and trustworthy." *Id.* (quotation marks and citation omitted). "[I]t is the lack of capacity to fabricate, not the lack of time to fabricate, that is the focus of the excited utterance rule." *Id.* at 551. But feeling ill after using drugs does not amount to a "startling event" for purposes of MRE 803(2). Indeed, while the prosecutor explains that the statement was made while Reynolds was feeling the effects of the drugs he consumed, the prosecutor does not explain how that amounts to a "startling event" that could trigger application of MRE 803(2), or provide any authority supporting that position. Nor would it appear that the circumstance of feeling ill would remove one's ability to reflect, or that feeling ill would make the statement spontaneous and therefore more trustworthy.

Although inadmissible under the grounds asserted, we conclude that no relief is warranted. An error in the admission of evidence is not grounds for reversal unless the defendant demonstrates that, "after an examination of the entire cause, it shall affirmatively appear that the error asserted has resulted in a miscarriage of justice." *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999) (quotation marks and citation omitted). The focus of the inquiry is on whether the error undermines the reliability of the verdict. *Id.* "[T]he effect of the error is evaluated by assessing it in the context of the untainted evidence to determine whether it is more probable than not that a different outcome would have resulted without the error." *Id.*

Here, even without Reynolds's statement, the evidence against defendant was overwhelming. There is no dispute that both Reynolds and Joshua died because they consumed the drugs purchased that night. The only real question was who the drugs came from. Despite defense counsel's best efforts, the evidence at trial suggested no other alternate sources beyond defendant. Video footage captured defendant meeting with Reynolds at the precise time when the drug transaction would have occurred. Further, when Brittni Brewster, defendant's romantic interest, contacted defendant after Reynolds was found dead, defendant denied having met with Reynolds or having anything to do with the events. Yet, again, video footage showed that Reynolds had met with defendant that night. And after defendant's cell phone was seized by police, it was remotely wiped of all data. While it was not proven who, exactly, caused that to occur, it would be no stretch to believe that defendant or someone acting on his behalf performed that task in order to remove incriminating evidence. While the evidence in this case was largely circumstantial, it was strong, and pointed directly to defendant's guilt. The admission of Reynolds's statement to Martin, although erroneous under the grounds asserted, does not warrant a new trial.

## C. "DRUG PROFILE" TESTIMONY

Next, defendant raises a number of issues related to "drug profile" testimony provided by Detective Lamar Rufner. We find no merit to any of these arguments.

Over defendant's objection, Detective Rufner was qualified as an expert in "street-level narcotics trafficking." Detective Rufner then testified regarding commonly used drugs in Adrian; differences between certain drugs in terms of potency, value, and lethality; the use of aliases or monikers by drug dealers; common methods of packaging; and methods of communication by narcotics dealers in the area. Detective Rufner also participated in the investigation of this case. He testified that defendant owned two cell phones, one a higher-end smart phone, and the other a

cheap and disposable flip-phone; and defendant used Snapchat, a method of communication popular among those trafficking drugs. These characteristics were consistent with the "drug profile" provided by Detective Rufner.

On appeal, defendant first argues that the "drug profile" testimony was improperly admitted. Defendant did not raise any such objection below, and therefore, the issue is unpreserved. *People v Aldrich*, 246 Mich App 101, 116; 631 NW2d 67 (2001).[5] The issue is thus reviewed for plain error. *People v Benton*, 294 Mich App 191, 202; 817 NW2d 599 (2011). "To avoid forfeiture of an unpreserved claim, the defendant bears the burden of establishing that: (1) error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error affected substantial rights." *People v Everett*, 318 Mich App 511, 526-527; 899 NW2d 94 (2017) (quotation marks and citation omitted). Even if those three elements are established, "Reversal is warranted only when the plain, unpreserved error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of the defendant's innocence." *Id*. at 527 (quotation marks and citation omitted).

Testimony regarding common traits, conduct, or methods of narcotics dealers is not inherently improper. Rather, such "drug profile" testimony is admissible "to assist the jury as background or modus operandi explanation." *People v Murray*, 234 Mich App 46, 56; 593 NW2d 690 (1999). But "there is often a very fine line between the probative use of profile evidence as background or modus operandi evidence and its prejudicial use as substantive evidence; the admissibility of profile evidence must effectively be determined case by case." *Id*. at 54-55. "In particular, a difficulty arises in cases in which profiles are admitted because the evidence of a drug profile must resemble, to some to degree, the defendant's own circumstances and characteristics in order to be relevant, MRE 401, but when the profile begins to resemble the defendant's circumstances and characteristics too closely, the profile can appear increasingly as substantive evidence of guilt." *Murray*, 234 Mich App at 55. "In other words, once the profile is found to be relevant to the case, the court will often be faced with a gray area in which it may be obvious that the criminal profile circumstances and characteristics closely resemble those of the defendant, yet also in which the use of the profile may be the only way to explain to the jury the circumstantial evidence in the case." *Id*. "This gray area is made even more difficult to navigate by the fact that profile evidence is usually offered by police officers testifying as expert witnesses." *Id*.

---

[5] Defendant argues that he preserved this issue by objecting to whether Detective Rufner could testify as an expert witness. An evidentiary issue is preserved by objecting at trial on the same ground asserted on appeal. *Aldrich*, 246 Mich App at 116. Defendant's objection was that the area of "street-level drug trafficking" was too vague. Defense counsel then suggested that he would object to questions posed to Detective Rufner when he had objections to make. But during Detective Rufner's testimony, counsel only objected once, to testimony concerning how drugs were packaged in another region, on relevancy grounds. That objection was sustained. As defendant never made any objections below that Detective Rufner's "drug profile" testimony was improper, defendant did not preserve the issue for review.

Thus, several factors should be considered to determine the admissibility of such evidence. First, the evidence should be admitted only for a proper purpose—"to assist the jury as background or modus operandi explanation." *Id*. at 56. "Second, the profile, without more, should not normally enable a jury to infer the defendant's guilt. The prosecutor must introduce and argue some additional evidence from the case that the jury can use to draw an inference of criminality; multiple pieces of a profile do not add up to guilt without something more." *Id*. at 57. "Third, because the focus is primarily on the jury's use of the profile, courts must make clear what is and what is not an appropriate use of the profile evidence. Thus, it is usually necessary for the court to instruct the jury with regard to the proper and limited use of profile testimony." *Id*. "Fourth, the expert witness should not express his opinion, based on a profile, that the defendant is guilty, nor should he expressly compare the defendant's characteristics to the profile in such a way that guilt is necessarily implied." *Id*.

Defendant argues that Detective Rufner crossed the line of providing background information and instead provided substantive evidence that defendant was a drug dealer. We disagree. Detective Rufner testified that drug dealers operate in certain ways. It was also true that the evidence presented at trial showed that defendant had some of these same characteristics. But it is clear that the prosecutor did not present Detective Rufner in order to opine that defendant was guilty or that he was, in fact, a drug dealer.

Defendant points to Detective Rufner's "walks like a duck" response on redirect as testimony that crossed the line into substantive evidence of defendant's guilt. Defendant believes this comment directly compared his own traits to the drug profile. The prosecutor never asked for such a comparison during her direct examination of Detective Rufner. Rather, it was defendant who asked Detective Rufner if certain traits, which were shared by defendant, would establish that the individual was a drug dealer. And on redirect, the prosecutor asked one question responsive to those questions posed by defense counsel, and which still did not ask Detective Rufner to opine regarding defendant's own guilt. Rather, the prosecutor clarified with Detective Rufner that it was the combination of factors, not the existence of a single factor, that made up the "profile." Again, Detective Rufner was not asked, and did not volunteer any testimony, comparing defendant to the "profile." Rather, Detective Rufner focused on the appropriate use of such evidence: "to assist the jury as background or modus operandi explanation." *Id*. at 56.

The prosecutor also did not rely solely on Detective Rufner's testimony. Rather, the case against defendant was primarily established by the testimony from Christopher and other witnesses who were intimately involved with the events that lead to the deaths of Reynolds and Joshua, and video evidence placing defendant alone with Reynolds at the exact place and time where the drug sale would have taken place. Detective Rufner's testimony was clearly not the only evidence that could be used to "draw an inference of criminality . . . ." *Id*. at 57.

In this case, the trial court did not give a jury instruction regarding the proper use of drug profile evidence. However, defendant also did not request one.[6] And the lack of an instruction is not dispositive because Detective Rufner's testimony was not a particularly important part of the

---

[6] Defendant now faults defense counsel for failing to do so, an issue that will be discussed below.

case against defendant,[7] and it was obvious from his testimony that he was merely providing background information, not opining directly on the question of defendant's guilt. What Detective Rufner provided was information that allowed the jury to understand other evidence presented in the case, and then use that understanding as an aid to determine whether *all* of the evidence presented at trial proved, beyond a reasonable doubt, that defendant delivered narcotics to Reynolds that ultimately caused Reynolds and Joshua to die from heroin toxicity. That is a proper use of drug profile testimony, and thus, there was no plain error in admitting that testimony.

Defendant faults the trial court for failing to give an instruction regarding the proper use of drug profile testimony, and for failing to give an instruction regarding the use of expert witness testimony. See M Crim JI 5.10. Any such issue is waived. Before the jury was instructed, defendant was provided with the opportunity to review the jury instructions and make any objections or requests. He made none. Then, after the jury was instructed, the trial court explicitly asked if the parties had any corrections or additions to make to the instructions. Defense counsel responded in the negative. "[B]y expressly and repeatedly approving the jury instructions on the record, defendant waived any objection to the erroneous instructions, and there is no error to review." *People v Traver*, 502 Mich 23, 42; 917 NW2d 260 (2018) (quotation marks and citation omitted).

Finally, defendant faults defense counsel for failing to request instructions regarding how to consider Detective Rufner's testimony, and for failing to object to Detective Rufner's drug-profile testimony. Claims of ineffective assistance present mixed questions of fact and law. This Court reviews any factual findings made by the trial court for clear error; the ultimate question of whether trial counsel was ineffective is a question of constitutional law that is reviewed de novo. *People v Russell*, 297 Mich App 707, 715; 825 NW2d 623 (2012). But where no evidentiary hearing has been held below, which is the case here, this Court's review is limited to the facts on the existing record. See *People v Wilson*, 242 Mich App 350, 352; 619 NW2d 413 (2000).

To prevail on a claim that trial counsel was ineffective, defendant must show (1) that defense counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance, a different result would have been reasonably probable. *Russell*, 297 Mich App at 715-716 (citation omitted). Establishing the first prong requires defendant to overcome the strong presumption that counsel's assistance was sound trial strategy. *Id*. "This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *Id*. at 716.

With regard to requesting jury instructions, defendant falls well short of showing that counsel's decision was anything but sound trial strategy. Counsel likely did not seek any such instructions because Detective Rufner's testimony played a very small role in the matter and was

---

[7] Defendant now claims that the prosecutor relied heavily on Detective Rufner's testimony. That is simply not true. The prosecutor's case relied largely on Christopher's testimony, video evidence, and to a somewhat lesser degree, the testimony of other witnesses not including Detective Rufner's "drug profile" testimony. Notably, in the prosecutor's closing arguments, the prosecutor mentioned Detective Rufner's testimony twice, and on neither occasion, discussed the "drug profile" testimony he provided.

not relied upon by the prosecutor in her closing arguments. Requesting an instruction or instructions on the matter would only have drawn the jury's attention to testimony that was, if anything, damaging to defendant's case. Defendant has not overcome the presumption that counsel's decision was sound trial strategy.

Regarding counsel's failure to object to Detective Rufner's testimony, as explained, that testimony was properly admitted. Counsel is not ineffective for failing to raise futile or meritless objections. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Moreover, even if counsel's failure to request the jury instructions or object to Detective Rufner's testimony could be considered constitutionally deficient, in light of the overwhelming evidence against him defendant cannot show that but for such errors a different result would have been reasonably probable. See *Russell*, 297 Mich App at 716. Accordingly, this claim of ineffective assistance also fails.

D. OFFENSE VARIABLE 5

Defendant next argues that the trial court erred by assigning 15 points to OV 5 (psychological injury to a member of the victim's family), MCL 777.35. We disagree. A challenge to the scoring of the OVs involves two standards of review. The trial court's factual findings, which must be supported by a preponderance of the evidence, are reviewed for clear error. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id*.

Defendant challenges whether 15 points were properly assigned to OV 5, MCL 777.35. This variable may be scored at either 15 points or zero points. If "[s]erious psychological injury requiring professional treatment occurred to a victim's family," 15 points must be assigned; if no such injury occurred, then no points should be assigned. MCL 777.35(1)(a) and (b). Pursuant to MCL 777.35(2), 15 points must be assigned "if the serious psychological injury to the victim's family may require professional treatment. In making this determination, the fact that treatment has not been sought is not conclusive."

For 15 points to be assigned to OV 5, there "must be some evidence of psychological injury . . . ." *People v Lockett*, 295 Mich App 165, 183; 814 NW2d 295 (2012). The statute makes clear that no proof is required showing that a family member has or intends to seek professional treatment. *People v Calloway*, 500 Mich 180, 186; 895 NW2d 165 (2017). While the "threshold may seem low, trial courts must bear in mind that OV 5 requires a '*serious* psychological injury.' In this context, 'serious' is defined as 'having important or dangerous possible consequences.' " *Id*. (emphasis in original; footnote omitted).

At sentencing, two individuals spoke. First, Tina Parish, Joshua's mother, explained that defendant "took my son, who was my everything." She explained that before Joshua died, she worked full-time. After she learned that Joshua died, she "couldn't even go to work. I mean, I'm just now getting' back to work full time. You know, my hair was falling out in clumps. I couldn't even get out of bed sometimes." Parish finished by explaining, "you took away my son and you can never replace that. Josh was one of a kind. And I miss him every day and I'll never see him again."

The second individual to speak was Jodie Reynolds (Jodie), who was Reynolds's mother. She explained, "Words cannot begin to express the pain and emotional devastation of a mother losing their child. This last one year, four months, three weeks, and four days have been the worst nightmare imaginable. And I don't even wish that on [defendant]. I don't wish that on anyone." Jodie could not "even put into words what we as a family and myself as a mother have gone through each and every day. It still just doesn't seem possible that my baby boy is gone."

Defendant argues that there "is nothing in the record indicating that Mr. Reynolds' and/or Joshua's families sustained any psychological injury." We disagree. Both Parish and Jodie spoke of the severe mental trauma they suffered because of the deaths of their respective sons. Parish could not go to work and could not get out of bed. Her distress caused her hair to fall out. Jodie described the loss of her son as "the worst nightmare imaginable" and as having caused her "pain and emotional devastation . . . ." While neither appears to have sought professional treatment, that is not dispositive. See *Calloway*, 500 Mich at 187. The degree of emotional trauma spoken of by both Parish and Jodie was sufficient to assign 15 points to OV 15. See *id*. at 188-189 (15 points were properly assigned to OV 5 based on evidence that the victim's mother and stepfather were struggling with the death of the victim, that the death had a "traumatic" effect on them, that they would be forever changed by the victim's death, and they continued to think about the victim daily).

### E.  PROPORTIONALITY OF DEFENDANT'S SENTENCES

Finally, defendant argues that his sentences are disproportionate. We disagree. "[T]he proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the 'principle of proportionality' set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), 'which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017). To the extent defendant has raised a constitutional challenge, this Court's review is de novo. *People v Skinner*, 502 Mich 89, 99; 917 NW2d 292 (2018).

Ultimately, defendant wishes to challenge whether his sentences are proportionate under the *Milbourn* framework. But as defendant acknowledges, his minimum sentences fall within the sentencing guidelines range.[8]  Pursuant to MCL 769.34(10), this Court must affirm defendant's sentences "absent an error in scoring the sentencing guidelines or inaccurate information relied upon in determining the defendant's sentence[s]." As discussed in the prior issue, the only challenge to the scoring of the sentencing guidelines is without merit. Defendant does not allege that inaccurate information was relied upon in determining his sentences. As such, MCL 769.34(10) directs that this Court must affirm the sentences.

Defendant acknowledges as much but argues that MCL 769.34(10) is no longer valid in light of *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015). This Court recently addressed

---

[8] Defendant's recommended minimum sentence range was 135 to 225 months, see MCL 777.62, meaning that his 225-month minimum sentence was at the very top of the recommended range.

-12-

this same argument and concluded, as it has before, that MCL 769.34(10) survived *Lockridge*. *People v Posey*, ___ Mich App___, ___; ___ NW2d ___ (2020) (Docket No. 345491), slip op at 7-9. This Court noted that our Supreme Court ordered arguments on an application filed in that Court in a different case and directed that this same issue be briefed.[9] *Id*. at ___; slip op at 8-9 (Docket No. 345491). But after hearing arguments, the Court unanimously denied leave to appeal. *Id*., citing *People v Ames*, 504 Mich 899; 929 NW2d 283 (2019). Although the Supreme Court's order in *Ames* is not binding, it did "signal the Supreme Court's acceptance of" *People v Schrauben*, 314 Mich App 181, 196 n 1; 886 NW2d 173 (2016), where this Court held that *Lockridge* did not alter or otherwise diminish MCL 769.34(10). *Posey*, ___ Mich App at ___; slip op at 8 (Docket No. 345491).

In *Posey*, this Court declined the invitation to declare a conflict with *Schrauben*, and also stated that it agreed with *Schrauben*'s holding. *Id*. at ___; slip op at 8-9 (Docket No. 345491). This Court also explained that sentences within the guidelines are not wholly unassailable. *Id*. at ___; slip op at 9 (Docket No. 345491). Rather, the statute did not, and could not, preclude constitutional challenges, "e.g., an argument that a sentence constitutes cruel and unusual punishment." *Id*. Defendant here, however, makes no such challenge. Following *Posey*, *Schrauben*, and what is implicit from the outcome of *Ames*, we again conclude that, because defendant's sentences fall within the sentencing guidelines, his challenge to the proportionality of that sentence cannot be considered on appeal.

Affirmed.


/s/ Elizabeth L. Gleicher
/s/ Mark J. Cavanagh
/s/ Anica Letica

---

[9] *People v Ames*, 501 Mich 1026; 908 NW2d 303 (2018).